**NIKON, INC., Plaintiff,**

*v.*

**IKON CORP., Defendant.**

No. 89 Civ. 6044 (KMW) (NG).

United States District Court, S.D. New York.

Oct. 16, 1992.

---

Jay Begler, Andrew Galway, Mark Peroff, Denise Lindenauer, Sullivan, Galway, Begler & Peroff, New York City, for plaintiff.

Glenn Ostrager and Dara Onofrio, Ostrager & Chong, New York City, for defendant.

## OPINION AND ORDER

GERSHON, United States Magistrate Judge:

Nikon Inc. (Nikon) sues Ikon Photographic Corporation (Ikon) for trademark infringement and false designation of origin under Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), and for trademark dilution under Section 368–d of New York's General Business Law for its use of the mark IKON.[1] The following constitute my findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

Nikon has been promoting and selling cameras bearing the mark NIKON in the United States for over 40 years. Nikon is

---

1. In this opinion, all trademarks will be set in all capital letters regardless of the print style used in commerce.

the owner of U.S. Trademark Registration No. 569,949 for NIKON for cameras, and several other Registrations for NIKON in connection with various other products, including sunglass and eyeglass frames, microscopes, image analyzers, knives, watches, pens, towels, jackets, hats and stuffed animals. It is undisputed that NIKON is a world-famous mark that is associated with high quality 35 mm cameras.

Ikon was formed in 1986 and began marketing inexpensive cameras under the mark IKON, which consisted of block letters, and a lens shutter design enclosed within the letter "O", in May of 1987. On June 8, 1987, Ikon filed an application in the U.S. Patent and Trademark Office, serial no. 665,155, to register this mark for cameras. Registration was refused on August 31, 1987, because it was found confusingly similar to ZEISS IKON, a mark owned by Carl Zeiss Stiftunj (Zeiss), a German company. This refusal to register was withdrawn by the U.S. Patent and Trademark Office because the cited ZEISS IKON mark was found to have expired. The U.S. Patent and Trademark Office later became aware of an active ZEISS IKON registration and again denied Ikon's application, citing ZEISS IKON as the reason for the denial. Ikon filed a petition to cancel the active ZEISS IKON mark on October 12, 1987. The application to register the IKON mark was held in abeyance pending the cancellation proceeding.

When Nikon's general counsel learned of Ikon's use of the mark IKON in February 1989, he asked outside counsel to investigate and, on May 31, 1989, Nikon wrote Ikon protesting the use of the IKON mark. Ikon did not cease using the mark, and Nikon commenced this action on September 12, 1989.

In the meantime, in August of 1989, a settlement agreement had been reached between Zeiss and Ikon. The IKON mark was determined available for registration by the U.S. Patent and Trademark Office and published for objection on May 1, 1990. Nikon commenced a proceeding in the U.S. Patent and Trademark Office opposing the registration of the IKON mark. That administrative proceeding was stayed pending the outcome of this action.

Before publication of application serial no. 655,155, Ikon sought registration of an alternative, stylized format of the IKON mark. Ikon filed an application for registration, serial no. 74–028,798, in the U.S. Patent and Trademark Office on February 13, 1990. Nikon did not oppose the application. The alternative format consists of the word IKON, with a stylized I, and a lens shutter design enclosed in the letter "O". The mark differs from the first mark, application serial no. 655,155 in that it contains the stylized "I". This alternative format was issued registration no. 1,624,611, on November 17, 1990. Nikon subsequently filed a petition to cancel Ikon's registration of this mark. The Patent and Trademark Office stayed the cancellation petition pending the outcome of this litigation.

Ikon has also registered the following secondary word trademarks: 1) "110 PLUS," registration no. 1,539,119, dated May 15, 1989; 2) "SUPER–T," registration no. 1,548,120, dated July 18, 1989; and 3) "SMILE," registration number 1,549,963, dated August 1, 1989. Ikon also uses the trademark "Catch 4" and "IKON REGENT;" registration of the latter has been stayed pending the outcome of this litigation. Ikon also obtained registration on March 1, 1988, of its lens shutter design.

### Trademark Infringement and False Designation

■ The central issue in a trademark infringement and false designation of origin action is the likelihood of confusion, that is, " 'whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.' " *Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 579–80 (2d Cir.1991) (*quoting McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1130 (2d Cir.1979)); *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621 (2d Cir. 1983). The Court of Appeals for the Second Circuit, in *Polaroid Corp. v. Polarad*

*Electronics Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), set forth factors to be evaluated in determining the likelihood of confusion between two marks. The *Polaroid* factors are as follows: the strength of the senior user's mark, the similarity between the two marks, the competitive proximity of the products, the likelihood that the senior user will bridge the gap, actual confusion, the junior user's good faith, in adopting its mark, the quality of the junior user's product, and the sophistication of the buyers. *Id.* at 495. This list is' not exhaustive, nor is any single *Polaroid* factor determinative. *Lang*, 949 F.2d at 580. "Instead, each factor must be considered in the context of the others, and balanced to determine whether a likelihood of confusion exists." *Id.* "Originally formulated to assess confusion of noncompeting products, *Polaroid*'s test now extends to competing products as well." *Banff, Ltd. v. Federated Dept. Stores, Inc.*, 841 F.2d 486, 490 (2d Cir.1988); *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 965–66 (2d Cir. 1981).

Strength of the Mark

▮ The strength of the senior mark is determined by its distinctiveness, " 'its tendency to identify the goods' as coming from a particular source." *Lang*, 949 F.2d at 581 (*quoting McGregor–Doniger*, 599 F.2d at 1131). "The strength or distinctiveness of a mark determines ... the degree of protection it will be accorded." *McGregor–Doniger*, 599 F.2d at 1131. "The relative strength of a mark is measured by two factors: (1) the placement of the mark on the spectrum of marks; and (2) the marketplace recognition value of the mark." *Edison Bros. Stores, Inc. v. Cosmair, Inc.*, 651 F.Supp. 1547, 1554 (S.D.N.Y.1987).

Conceding the strength of the NIKON mark, Ikon argues that NIKON's fame decreases the likelihood of confusion between IKON and NIKON. In support of its argument, Ikon relies on a statement in *B.V.D. Licensing Corp. v. Body Action Design, Inc.*, 846 F.2d 727 (Fed.Cir.1988), that

[t]he fame of a mark cuts both ways with respect to likelihood of confusion. The

better known [a mark] is, the more readily the public becomes aware of even a small difference.

*Id.* at 729. Recently, in *Kenner Parker Toys Inc. v. Rose Art Industries, Inc.*, 963 F.2d 350, 354 (Fed.Cir.1992), the Court of Appeals for the Federal Circuit reversed a decision of the Trademark Trial and Appeal Board that relied on the same language in *B.V.D.* relied upon by Ikon. Reasoning that consumers were more likely to recognize variances from a famous mark, the Trademark Trial and Appeal Board concluded that "the fame of ... [the] mark permitted greater, rather than less, legal tolerance for similar marks." *Kenner Parker Toys*, 963 F.2d at 353. The *Kenner* Court found the Board erred in its reading of *B.V.D.* and concluded that "[t]he holding of *B.V.D.*, to the extent it treats fame as a liability, is confined to the facts of that case." *Id.* at 354. The Federal Circuit explained:

A competitor can quickly calculate the economic advantages of selling a similar product in an established market without advertising costs. These incentives encourage competitors to snuggle as close as possible to a famous mark.... Recognizing the threat to famous marks from free riders, this court's predecessor allowed "competitors [to] come closer" to a weak mark.... A strong mark, on the other hand, casts a long shadow which competitors must avoid.

*Id.* at 353 (*quoting Sure–Fit Prods. Co. v. Saltzson Drapery Co.*, 254 F.2d 158, 160 (C.C.P.A.1958). Thus, contrary to Ikon's suggestion, "[f]amous or strong marks enjoy a wide latitude of legal protection." *Kenner Parker Toys*, 963 F.2d at 352; *accord Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir.1987); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 873 (2d Cir. 1986).

Here, it is undisputed that NIKON is a strong, world-famous mark. The mark NIKON is arbitrary or fanciful; it has no meaning outside of its use by plaintiff as a trademark. While an arbitrary mark does not require proof of secondary meaning to

be protected under the Lanham Act, "[p]roof of secondary meaning, acquired perhaps through successful advertising, can only enhance the strength of [Nikon's] mark and thus enlarge the scope of protection to which it is entitled." *McGregor–Doniger*, 599 F.2d at 1132. Nikon has engaged in massive marketing and promotion of its mark for decades. Nikon's current advertising and promotion costs are in excess of one million dollars per month, and its annual advertising budget for all Nikon Photo Group products is in excess of twenty million dollars. Through heavy advertising and promotion for close to 40 years, Nikon has made its completely arbitrary and fanciful mark a household name for cameras. In short, the mark NIKON is one of the most famous marks in the photography world.

In sum, the NIKON mark is indisputably strong, not only because it is entirely fanciful but because it is famous and has taken on secondary meaning within the marketplace. It is therefore entitled to a broad range of protection. This factor weighs heavily in Nikon's favor.

Similarity between the Marks

 Marks are similar if they give the same overall commercial impression when viewed separately. *Berkshire Fashions, Inc. v. Sara Lee Corp.*, 725 F.Supp. 790, 795 (S.D.N.Y.1989), *aff'd*, 904 F.2d 33 (2d Cir.1990). As one Court described this *Polaroid* factor,

> [s]imilarity, for these purposes, is a functional test which must include "all the factors that could reasonably be expected to be perceived by and remembered by potential purchasers" to determine whether it "is likely to provoke confusion." *McGregor–Doniger*, 599 F.2d at 1133. One must consider both the simi-

larity of the names and the manner of their presentation to the public. *Edison*, 651 F.Supp. at 1555.

IKON is identical to NIKON except for the absence of the initial "N." Ikon presents its mark in three alternative formats.[2] Nikon presents its NIKON mark in one format only.[3] The visual similarity of the marks is strongest between NIKON and Ikon's non-stylized "I" unitary word mark. Both are in solid black block letters with the first letter slightly larger than the remaining letters. The marks are visually less similar when IKON is presented in its stylized "I" format, in its composite form (*i.e.*, with REGENT), or when the shutter wheel design is used to represent the letter "O." However, Ikon has only one camera that uses the mark IKON REGENT, the IC–220, and the stylized "I" format is not used on all of Ikon's cameras and camera packaging. Moreover, many advertisements for Ikon's products are not in the stylized "I" format, and displays created by store owners have omitted both the stylized "I" and the lens shutter design.

There is also great similarity in the sounds of NIKON and IKON. Phonetically, the marks are substantially identical: they share phonemes (sounds), have two syllables and the same stress pattern. The only difference between the marks is the one letter consonant sound at the beginning of NIKON. While some, but not all, of the experts who testified thought that the initial part of a word is more important for word recognition than the ending of the word, whatever differentiation the "N" provides in theory is often obscured when the marks are referred to in common speech. For example, the statement "I own an IKON" can easily be understood by the listener to mean the speaker owns "a NIKON." Additionally, the marks share the same ending suffix "on" or "kon" and

---

**2.** The first format consists of the word IKON in block letters with a lens shutter design representing the letter "O"; the second format consists of the first format plus the stylization of the letter "I"; the third format is a composite word mark with the word IKON, in block letters and a lens shutter design enclosed in the letter "O," followed by the word REGENT.

**3.** Nikon's mark always consists of the word NIKON in block letters with a slight slant to the right. Nikon does, however, use various lens shutter designs on its TOUCH line of cameras. The design is inserted between the two words in the secondary mark, for instance, "ONE [design] TOUCH" or "ACTION [design] TOUCH."

they rhyme, which increases the association between the words.

The marks are also similar in that they both are arbitrary and have no meaning independent of their use as trademarks for cameras. Ikon argues that IKON is not arbitrary but rather that it is suggestive or descriptive of cameras because "ikon," more commonly spelled "icon," is a word in the English language, some meanings of which are related to visual or pictorial images. Ikon argues not only that the word "icon" is common enough that people associate it with its meanings related to visual or pictorial images, but that people will associate IKON with "icon."

The word "icon," while it appears in the dictionary, is not a commonly used word. That a word is in a dictionary does not necessarily mean that most people are familiar with it or its meanings. While "icon" is in increasing use, the increasing use is to connote a celebrity or idol. This is a meaning admittedly unrelated to cameras. "Icon" is also used to mean a religious pictorial representation or a computer symbol. However, while Ikon established that "icon" is a word that, among other meanings, means a religious pictorial representation (and was even used in that way by Nikon at a Photo Marketing Association trade show, in a display showing photographs of religious paintings, entitled "Icon by Nikon"), it did not show that this usage of "icon" was in common parlance.

Most importantly, while "ikon" is, in some dictionaries, an accepted spelling of the English word "icon," it is neither the preferred nor usual spelling. Indeed, except for dictionaries and articles discussing IKON brand cameras, there were only three "ikon" usages offered by the defendant. Ikon presented expert testimony that attempted to establish that there was a c/k variance so commonly understood in the English language that a person seeing IKON would understand it to be "icon" and know it to be an English word associated with a pictorial image. The persuasive expert evidence was to the contrary. First of all, most of the examples relied upon by Ikon's experts were proper nouns, e.g.,

Cara/Kara, Carl/Karl, Kathleen/Cathleen, Eric/Erik, Monica/Monika. Nikon's expert established convincingly that there is no c/k interchangeability rule of English grammar nor even a phenomenon sufficiently common that people would expect it. On the contrary, most words in English using "c" or "k," including proper nouns, cannot use "c" or "k" interchangeably. For example, "Mike" with a "c" becomes "mice," "like" becomes "lice," "lake" becomes "lace," and "key" becomes "cey."

After evaluating each mark's visual, auditory and cognitive impact, I conclude that they are very similar. And this similarity is magnified when the marks are considered on products in the marketplace. First, as discussed in more detail below, there is similarity in the basic physical characteristics of Nikon's and Ikon's automatic 35 mm cameras: both are of a black, molded plastic construction, and they are approximately the same weight and share the same general appearance. While Ikon packages many of its cameras in blister packs and Nikon only packages one model in blister packs, both parties package their products in boxes. Moreover, while there are differences in coloration and types of packaging, the cameras are often displayed outside of their packages. Finally, in stores that carry both parties' cameras, the two brands are often displayed side by side. Indeed, in the defendant's own camera store, Central Park Camera, NIKON brand cameras were displayed within six inches of IKON brand cameras and an advertisement for IKON cameras in the window used IKON in its non-stylized format.

Given the overall impression created by the marks in their consumer context, I conclude that the marks are very similar. This factor weighs in Nikon's favor.

Competitive Proximity of the Products

The focus here is on the extent to which the products are competing in the marketplace. In general, this requires inquiry into the classification of the products, the channels of trade through which the products move and their customer profiles. "To the extent the goods (or trade names) serve the same purpose, fall within the

same general class, or are used together, the use of similar designations is more likely to cause confusion." *Lang*, 949 F.2d at 582. "To establish likelihood of confusion, competing goods require less proof under the *Polaroid* factors than non-competitive items." *Banff, Ltd.*, 841 F.2d at 492; *Gordon Electronics, Inc. v. Katone Corp.*, 1991 WL 8485, *4 (S.D.N.Y. January 17, 1991); *Eaton Allen Corp. v. Paco Impressions Corp.*, 405 F.Supp. 530, 533 (S.D.N.Y.1975).

Nikon and Ikon both attach their marks to the same general class of products, cameras. Nikon's camera lines includes the "F" series which is comprised of sophisticated single lens reflex (SLR) cameras; the TOUCH series which is comprised of 35 mm compact automatic focus (or "point and shoot") cameras; and the NIKON SMILE-TAKER, a less expensive automatic focus model. The SLR cameras are high end, expensive cameras, selling for hundreds of dollars. The TOUCH point and shoot series has an approximate actual retail price point of $110–$200, and the NIKON SMILETAKER retail price is $70–$90. Nikon point and shoot cameras have a variety of automatic features including: automatic focus, automatic film loading, automatic rewind, built-in automatic flash, automatic film speed setting and date-imprinting features. Nikon has marketed its point and shoot cameras since 1983 and had sold 1.5 million units, for a total $170,000,000, prior to the entry of IKON brand cameras into the marketplace. From 1986 through November 1991, Nikon sold 3,291,600 point and shoot cameras, totalling $473,446,000 in sales, and 1,091,000 SLR cameras, totalling $432,949,000 in sales. In short, Nikon's point and shoot line is currently its largest grossing camera line.

Ikon's camera lines include fully automatic 35 mm cameras, fixed focus 35 mm cameras, and 110 cameras. The fully automatic cameras include the IC–50, IC–50D, IC–60 and IC–60D. These cameras have automatic focus, automatic film loading, automatic rewind and built-in automatic flash. The IC–60 and IC–60D also have automatic film speed setting; date-imprinting features are included on cameras with the "D" model designations. These automatic cameras have a retail price of $75–$125. Ikon's manual fixed focus 35 mm cameras include the IC–15C, IC–25 and the FUN Camera. These cameras have a retail sales price of $8–$22. Ikon has several fixed focus cameras that have power wind and rewind (e.g., IC–35, IC–700, IC–600, IC–600D), and automatic flash and film speed setting (specifically the IC–40 and IC–40D). These cameras have an approximate retail price of $25–$50. Ikon's 110 camera line includes the 110 mini, which is compact but has no features, and the 110 Plus and SUPER–T, which have built-in flash. These cameras sell at retail from $2–$15. Many of Ikon's 110 and fixed focus 35mm cameras come in an array of colors. Ikon's automatic focus cameras account for 11% of Ikon's total domestic camera sales from 1986 through 1991, or $461,801.00 for 8,714 units.

There is a substantial overlap between Nikon's low-end cameras and Ikon's high-end cameras, that is, between Nikon's point and shoot line, which includes the TOUCH series and the NIKON SMILETAKER, and Ikon's fully automatic 35 mm cameras, such as the IC–50 and IC–60. These Nikon and Ikon cameras have many of the same features and sell at roughly the same price points. Significantly, sales of Ikon's IC–50s and IC–60s account for 11% of Ikon's total domestic sales, and Nikon's point and shoot line is currently its best selling product both in terms of units sold and sale dollars.

Nikon and Ikon cameras move through the same channels of trade. Nikon markets its TOUCH series through camera specialty shops, department stores, electronics stores, discount stores, catalogue showrooms and mail order catalogues. Nikon markets its NIKON SMILETAKER camera to both chain drug stores and other mass merchandisers. Similarly, Ikon markets its cameras through electronics stores, catalogue companies and chain stores. While some cameras in the parties' lines would not be found in the same stores, *e.g.*, Ikon's very inexpensive 110 mini and Nikon's "F" series SLR cameras, many stores carry

both product lines. Plaintiff presented testimony from two private investigators who were assigned projects that involved taking photographs of camera store windows displaying both product lines. One investigator visited twelve camera stores, six of which carried both cameras. A different investigator visited seventeen stores, four of which had both Nikon and Ikon cameras displayed in their windows. Indeed, Central Park Camera, a store then owned by the President of Ikon, sold both camera lines. Defendant's own expert testified that probably hundreds of stores carried both product lines.

Finally, there is an overlap in the consumer profiles of each of the camera lines. The target population for Nikon's point and shoot line is consumers who want an easy to use, quality camera at an inexpensive price. Often Nikon's advertisements for this line are aimed at the inexperienced or amateur photographer, although they are not marketed exclusively to the amateur. Ikon's target population overlaps with Nikon's to some degree. While consumers of Ikon's 110 cameras are typically children or parents who are buying a camera for their children, consumers of Ikon's 35 mm cameras are budget-minded purchasers who desire an easy to use, inexpensive 35 mm camera. It seems clear that the same type of camera in each parties' line would have the same consumer profile.

■ However, the product lines do differ. For instance, Ikon's 110 camera line includes cameras that have been described as "trinket" or "toy" cameras at retail price of $2–$15, and fixed focus manual 35 mm cameras of light weight construction for $8–$22. In contrast, Nikon manufactures sophisticated SLR cameras appropriate for professional use. The lack of competition between segments of each party's line does not diminish the significance of the direct competition between the lines,

particularly since the overlap occurs in an area of high sales volume.

Ikon's suggestion that the parties may cease being competitive is not only meritless but irrelevant. There was substantial testimony that the point and shoot market is expanding while the SLR and 110 markets are diminishing. Jack Elo, the President of Ikon, testified that his sales strategy was simple: he follows the market. Thus, as long as it is profitable for Ikon to remain in the point and shoot market, it will do so, as will Nikon and other point and shoot competitors. Moreover, Elo's testimony that he will be forced out of the automatic focus point and shoot market by the big five camera companies, who are moving into the lower end of the market, is contradicted by testimony he gave during the preliminary injunction hearing to the effect that he was planning to discontinue his current SMILE camera, a 110, and use the SMILE mark on a 35 mm camera that may compete with Nikon's NIKON SMILE-TAKER. In any event, speculation that the parties may become less competitive at some future point is irrelevant to Nikon's right to relief today.

Likelihood that Senior User will Bridge the Gap

■ Here, the inquiry focuses on likelihood of the senior user entering the market of the junior user. *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 78 (2d Cir.1988). Where "both users operate in the same market, this very fact indicates that a greater likelihood of confusion exists than if they operated in different markets." *Id.*

As discussed above, Nikon and Ikon are in the same market. In addition to its TOUCH line, Nikon currently is marketing the NIKON SMILETAKER, an automatic 35 mm point and shoot camera at the retail price point of $70 to $90.[4] Ikon markets similar cameras at a retail price point of

---

**4.** Nikon presented evidence that it intends to introduce an even less expensive 35 mm camera at the end of 1992 with a retail price point of $50–$70. "'[T]he intent of a prior user to expand or its activities in preparation to do so, *unless known by prospective purchasers,* does not affect likelihood of confusion.'" *Lang,* 949

F.2d at 582 (emphasis by court in *Lang*) (*quoting Restatement (Third) of Unfair Competition* § 21, reporter's note at 210). Since Nikon has not presented any evidence that would indicate consumers are aware of its plan to launch this new inexpensive camera, this evidence is not being considered.

$75 to $125. Aside from comparable price points, these cameras have comparable automatic features, such as automatic focus, automatic wind and rewind, and built-in automatic flash. Thus, even though Nikon has no intention of ever entering the 110 market, Nikon has already bridged the gap with the top end of Ikon's product line. This factor weighs in Nikon's favor.

Sophistication of the Buyers

■■■■ Consumer sophistication refers to the care and attention a consumer takes in making a purchase. *See Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1007 (2d Cir.1983); *McGregor–Doniger*, 599 F.2d at 1137. "The greater the value of an article the more careful the typical consumer can be expected to be...." *McGregor–Doniger*, 599 F.2d at 1137. More sophisticated consumers are less likely to be confused regarding a product's source. *Plus Products*, 722 F.2d at 1007; *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1228 (2d Cir.1987).

The average consumers of Nikon's upper line cameras are often purchasers who are professional or experienced photographers. In addition to experience, the price of these high end cameras would indicate that a consumer would exercise a good deal of care and attention in making the purchasing decision. Average consumers of Nikon's point and shoot cameras, ranging in price from $70 to $200, are beginner or amateur photographers. While these cameras are not purchased on impulse, they are heavily marketed toward snapshot photographers with little or no camera experience. At least a significant number of these purchasers are not sophisticated.

Average consumers of Ikon's 110 and low-priced 35 mm cameras are unsophisticated. Many of these cameras are purchased on impulse, perhaps by children or parents purchasing for children. Given their cost, Ikon's higher-priced automatic 35 mm cameras, are not impulse purchases. However, as with Nikon's similarly priced cameras, a significant number of consumers of these cameras are not sophisticated. Particularly as to the products that are directly competing, the lack of sophistication of a significant number of consumers favors Nikon.

Quality of the Junior User's Product

■■■■ The Second Circuit has recognized two approaches in evaluating the quality of the junior user's product. *See Hasbro*, 858 F.2d at 78 (discussing cases). On one hand, "[t]his factor reflects the law's recognition that [the senior user] should not be subjected to the risk that the public perception of his product will suffer if it is associated with a product of inferior quality." *Proctor & Gamble Co. v. Johnson & Johnson Inc.*, 485 F.Supp. 1185, 1202 (S.D.N.Y. 1979), *aff'd*, 636 F.2d 1203 (2d Cir.1980); *accord Lois Sportswear*, 799 F.2d at 875. On the other hand, "[t]he lack of marked difference in quality between goods" has been used to support an "inference that they emanate from the same source." *Centaur Communications*, 830 F.2d at 1228. Here, depending upon which models are considered, both approaches are applicable.

Ikon's products are of good quality for their price. However, many of them, especially Ikon's 110 models, are inexpensive, lightweight cameras that have been described as toy-like or trinkets. Ikon's more sophisticated cameras, such as the IC series, are of better construction and quality and, on outward visual appearance, are similar to Nikon's similarly priced point and shoot cameras. However, Ikon does not supervise the manufacturers of its cameras for quality control and Elo's testimony regarding the quality checks he performs [5] on the products he purchases for resale under the IKON name established that Ikon does not have the quality control of Nikon.

Nikon's products have a reputation for high quality. The company has been given awards for its pioneering skills and quality in the United States, Europe and Japan. Nikon has devjack eloped automated pro-

---

**5.** Before adopting a camera, Elo, who has no technical expertise, testified that he takes test pictures. Thereafter, he periodically checks the quality of his cameras by removing some from their packaging, inserting film and batteries, and taking test pictures.

duction equipment that ensures uniformity and reliability of Nikon products. Nikon cameras must pass testing and inspection quality control procedures.

In sum, there is a vast difference between the quality of Ikon's trinket cameras and Nikon's SLR cameras. While there is a lack of discernible differences in quality between the products in the overlapping area of the market, Nikon's advanced quality control procedures ensure that Nikon products are of the highest quality and reliability. Thus, this factor weighs in Nikon's favor.

Actual Confusion

 To succeed, plaintiff must show that an "appreciable number" of consumers are likely to be confused as to the source of defendant's product. *Lang*, 949 F.2d at 579–80. It is difficult to prove actual confusion, and therefore it is not essential that a plaintiff show actual confusion to prove likelihood of confusion. *Lois Sportswear*, 799 F.2d at 875; *accord Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162 (2d Cir.1991); *Centaur Communications*, 830 F.2d at 1227. However, the absence of evidence of actual confusion for a period in which there were substantial sales "is a strong indicator that the likelihood of confusion is minimal." *Plus Products*, 722 F.2d at 1006; *accord Lois Sportswear*, 799 F.2d at 875; *E.S. Originals Inc. v. Stride Rite Corp.*, 656 F.Supp. 484, 489–90 (S.D.N.Y.1987).

Here, there is only very limited evidence of actual confusion. There was evidence that on two occasions Ikon products were misdelivered to Nikon. It is unclear whether these packages were from the same or different mass marketing stores that had purchased Ikon products. Plaintiff presented no other evidence of misdirected mail, and there was no evidence showing misdirected telephone calls. Isolated instances of misdelivered mail are inconsequential. *See C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir.1985); *Information Clearing House, Inc. v. Find Magazine*, 492 F.Supp. 147, 160 (S.D.N.Y.1980).

It is significant that Nikon did not undertake a consumer trademark survey to show actual confusion. Nikon's suggestion that Ikon's market activity is so insubstantial that the absence of evidence of actual confusion cannot support an inference of likelihood of confusion is rejected. Ikon has had substantial domestic camera sales of $4,782,600 under the IKON mark over a 5 year period. Clearly this is distinguishable from the case relied on by plaintiff where the Court found the junior user's sales "minimal ... and there has been little chance for actual confusion as yet." *Lois Sportswear*, 799 F.2d at 875. The absence of such evidence is even more telling here where plaintiff, having ample opportunity to conduct a consumer survey, failed to do so, although it had undertaken such a survey on short notice for the preliminary injunction hearing on Ikon's counterclaim. *See E.S. Originals*, 656 F.Supp. at 490.

Plaintiff did present compelling evidence of "passing off" practices by retailers, however. Two retailers, including an employee at Central Park Camera, a store owned by the President of Ikon, represented to private investigators posing as consumers that Ikon was a division or affiliate of Nikon. The first instance occurred on August 15, 1990 when a private investigator hired by the plaintiff was sent to Central Park Camera to take a picture of the store window and inquire about purchasing a camera. When the investigator asked a salesperson, who identified himself only as Sammy, about IKON brand cameras, Sammy told him that IKONs were made by the same people who made NIKONs and that Nikon authorized the manufacturing of IKON cameras. The second incident occurred when a different private investigator went into Golden Touch Photo in Brooklyn to purchase a camera. The salesperson, who identified himself as the owner of Golden Touch Photo, showed the investigator IKON brand cameras. When the investigator told the store owner that he had never heard of that brand, the owner replied that Nikon made the lens and the equipment inside the camera while Ikon made the plastic outer casing. Plaintiff also presented evidence that NIKON and

IKON cameras were displayed side-by-side in stores, including Central Park Camera, and that Ikon's registered shutter wheel design was placed on a store-made sign for NIKON cameras.

■ While Ikon may not be held responsible for the acts of independent retailers of whose conduct it was unaware, *cf. Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 853–54, 102 S.Ct. 2182, 2188, 72 L.Ed.2d 606 (1982), evidence of "passing off" even by independent retailers is relevant in determining the likelihood of confusion of similar products. *See E.S. Originals*, 656 F.Supp. at 490 n. 10. This is particularly true since one of the "passing off" incidents occurred at Central Park Camera, a retail store owned by the President of Ikon and within his control. The misrepresentations made by the salespersons indicate either their intent to deceive consumers as to the goods' origins or, indeed, their own confusion as to the origin of the goods.

Ikon's evidence that a retailer could just as easily represent to consumers that Ricoh was from Minolta or that Chinon was from Nikon was not persuasive. While I accept that there are unscrupulous retailers who will represent almost anything to a consumer to make a sale, I find that misrepresentation regarding the relationship between Nikon and Ikon is facilitated by the similarity of their marks, and therefore more persuasive and likely to confuse ordinarily prudent purchasers. Thus, while the evidence of passing off was limited, I find it of some probative value in determining the likelihood of confusion between the two marks.

Nikon's failure to undertake a consumer survey to demonstrate actual confusion favors Ikon. However, the conclusion to be drawn from Nikon's failure is mitigated to some extent by the evidence of passing-off, particularly since some of it occurred in a store owned by Elo.

Junior User's Good Faith in Adopting Its Mark

■ "This factor 'looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product.'" *Lang*, 949 F.2d at 583 (*quoting Edison*, 651 F.Supp. at 1560). "[B]ecause adoption of a trademark with actual knowledge of another's prior registration of a very similar mark may be consistent with good faith," prior knowledge of a senior user's mark does not in itself imply bad faith. *Lang*, 949 F.2d at 583–84. "However, actual or constructive knowledge *may* signal bad faith. Indeed, '[i]n this circuit and others, numerous decisions have recognized that the second comer has a duty to so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer.'" *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir.1987) (*quoting Harold F. Ritchie Inc. v. Cheseborough–Ponds, Inc.*, 281 F.2d 755, 758 (2d Cir.1960)).

Here, Elo, President of Ikon, selected the IKON mark. At the time he organized Ikon Photographic Corporation in 1986, Elo had over twenty years of experience in the photography industry. He had been a camera salesperson, and he had owned two camera stores. He sold all camera types, including NIKON brand cameras.

It is undisputed that Elo, after twenty years in the business, was fully aware of the NIKON trademark at the time he selected the IKON mark. Elo testified that he wanted a mark with a short name that would be easy to remember and that he was the person who ultimately selected the mark IKON. Elo claimed that he adopted the mark IKON after he saw the word "ikon" in the 1970 World Book Encyclopedia. He testified that he did not know the meaning of the word prior to learning of its definition as a religious pictorial representation from the encyclopedia. Within minutes of seeing "ikon" in the encyclopedia, Elo thought of ZEISS IKON, a mark used by a camera company that was no longer selling cameras but had been a prestigious leader in the industry at one time. Even though Elo never mentioned the name ZEISS IKON at his deposition, where he testified that he had never heard the word "ikon" before nor known what it meant

prior to seeing it in the encyclopedia, Elo testified at trial that "it was prestige to use the name Ikon after a great company such as Zeiss Ikon. It never occurred to my mind that I would think that people would think that I have any association with Zeiss Ikon." Notwithstanding Elo's twenty years of experience in the camera industry, which included selling NIKON cameras, he testified that he did not think of NIKON before making his selection. He said he thought of NIKON only after selecting IKON, but he did not think there was a problem because of the one letter difference between IKON and NIKON.

Elo testified that he chose to spell IKON with a "k" instead of a "c," as the word appeared in the encyclopedia, because he feared that his French and Spanish speaking customers would pronounce "icon" with a soft "c" or "s" sound instead of a hard "k" sound. This explanation is belied by the undisputed fact that the words "icone" in French and "icon" in Spanish are pronounced with a hard "k" sound. Interestingly, Ikon sells very little of its products to French or Spanish companies. Elo offered no explanation for why he feared that French or Spanish speaking customers would nonetheless use the soft "c" pronunciation. And it is unbelievable that Elo, who speaks both French and Spanish well enough to converse with French and Spanish speaking consumers about camera products, did not know the correct pronunciation of "icone" and "icon."

After selecting the name IKON, Elo consulted with a trademark lawyer regarding the availability of this mark for use on a then prospective camera line. The lawyer conducted a search report, which revealed both ZEISS IKON and NIKON as registered trademarks. Counsel, who testified at trial, stated that, in regard to NIKON, he advised Elo that some companies take a very proprietary stance, and that there was a risk that Nikon would challenge the use of IKON. Counsel discussed the possibility of litigation with Elo and told him that, if challenged, Elo could reassess use of the mark. Elo acknowledged that his counsel had spoken to him about NIKON, but denied any recollection whatever of the contents of those discussions. In light of the extent of the discussions and their significance to his business, I do not credit Elo's total lack of recall.

In light of the search report, and in an attempt to minimize risk, counsel suggested that Elo adopt a composite mark with a word other than IKON as the dominant part. This suggestion was steadfastly rejected by Elo, who insisted on the unitary IKON mark. Counsel also urged the use of alternative formats, including the adoption of a logo, and he referred Elo to a graphic designer. Although the designer created the lens shutter design currently used by Ikon, Elo must have known, from his twenty years of experience with cameras, that Nikon used a similar shutter wheel design on its point and shoot line. I am satisfied that counsel, who, in contrast to Elo, was not sophisticated about cameras, was not aware of this use by Nikon. In sum, I find that Elo undermined the purpose of adopting a logo, namely, to establish a dissimilar mark so as to avoid source confusion, without counsel's knowledge.

While counsel ultimately cleared the mark for use, in doing so, he relied, not improperly, on what Elo, who was experienced in the camera industry, advised him about his intentions and the market. For instance, Elo did not inform his lawyer that he intended to sell 35 mm automatic cameras and that Nikon sold similar cameras that were only slightly more expensive. Rather, counsel proceeded on the premise that his client would be marketing "trinket" cameras.

In light of the evidence, I cannot conclude that Elo's selection of the IKON mark was in good faith. First, Elo's explanation for how he came to choose IKON as a mark is unworthy of belief. If Elo wanted to select a name that would strike a "familiar" chord with consumers, as he argues, it is implausible that he would have selected a name the meaning of which was unknown to him until he saw it in an encyclopedia. Moreover, I do not credit Elo's choice of the rare "ikon" spelling of the word "icon," when familiarity and consum-

er recognition were a priority in his selection process.

Second, the suggestion that Elo did not think of the famous NIKON mark when he selected the name IKON, but did think of a formerly prestigious camera manufacturer which had been out of the market for 8 or 10 years, is incredible. Elo was not only familiar with the NIKON name, but had in fact sold NIKON products in his own camera store. Moreover, Elo rejected the use of a composite mark, which would have served to distinguish his mark, and he adopted a logo that, unbeknownst to his counsel, was markedly similar to one used by Nikon. Elo's decision, with full awareness of Nikon's rights, to select a mark very similar to NIKON with no reasonable explanation and his steadfast refusal to adopt a logo or composite mark that would help distinguish it from NIKON leads me to conclude that there was an intent to capitalize on Nikon's reputation and goodwill in the NIKON mark.

Balancing Factors

Although Ikon's federal registration of one of its marks and the absence of evidence of actual confusion other than evidence of passing off weigh against a finding of likelihood of confusion, all the other *Polaroid* factors weigh heavily in favor of a finding of likelihood of confusion.

NIKON is an arbitrary mark and has taken on secondary meaning in the marketplace. It is indisputably strong and entitled to a broad range of protection. The IKON mark is identical to the NIKON mark, save for the absence of one letter at the beginning of the word. Overall, the marks are very similar in sight, sound and meaning, and they create the same general impression in the marketplace. Ikon's similar mark is used on cameras that are directly competitive with Nikon cameras in a very lucrative area of the camera market. That a significant number of consumers of each parties' cameras are unsophisticated compounds the problem. Although very sophisticated purchasers of Nikon's high priced SLR cameras might not confuse an IKON brand camera with a NIKON brand camera, unsophisticated consumers of low-

er priced cameras might very well believe IKONs are made by or affiliated with Nikon. Such consumers are likely to associate Ikon's 110 and manual 35 mm cameras with Nikon's quality photographic equipment. The apparent similarity of quality in the overlapping area of the market may well increase confusion as to the source of Ikon brand cameras. Finally, it is clear that Ikon's selection of its mark was done with an intent to capitalize on the reputation and goodwill established in the mark NIKON.

In sum, Nikon has established trademark infringement and false designation of origin under the Lanham Act.

### Affirmative Defenses

Ikon argues that Nikon is guilty of laches because it did not institute this action until two and one-half years after IKON had been in open, continuous use with plaintiff's knowledge. To begin with, mere delay does not constitute laches. *See Saratoga Vichy Spring Co., Inc. v. Lehman,* 625 F.2d 1037, 1040 (2d Cir.1980); *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena,* 433 F.2d 686, 704 (2d Cir.1970), *cert. denied,* 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971). To be protected by the equitable doctrine of laches, defendant "must possess a right which is firmly planted in good faith." *Johanna Farms, Inc. v. Citrus Bowl, Inc.,* 468 F.Supp. 866, 881 (E.D.N.Y.1978); *accord Harlequin Enterprises Ltd. v. Gulf & Western Corp.,* 644 F.2d 946, 950 (2d Cir.1981); *Grotrian, Helfferich, Schultz Th. Steinweg Nachf. v. Steinway & Sons,* 523 F.2d 1331 (2d Cir. 1975). Additionally, defendant must establish that: 1) Nikon had knowledge of defendant's use of the mark IKON; 2) Nikon inexcusably delayed in taking action with respect to that use; and 3) Ikon will be prejudiced by permitting Nikon to assert its rights now. *Saratoga,* 625 F.2d at 1040. Defendant has not met its burden.

First, and most significantly, Ikon cannot establish its own good faith. "While an infringer claiming laches need not be in total ignorance of another's mark, it must be able to demonstrate the absence of any

intent to confuse and deceive the public...." *Cuban Cigar Brands N.V. v. Upmann Int'l, Inc.*, 457 F.Supp. 1090, 1098–99 (S.D.N.Y.1978) (footnotes omitted), *aff'd*, 607 F.2d 995 (2d Cir.1979). The facts found here point to the opposite conclusion. As the Court in *Cuban Cigar* stated:

> Defendant has tried to move its name and mark as close as possible to what it perceived to be the legal line, rather than keeping its mark and use distinct and separate; its misperception of where that line lies, evidencing as it does an intent to confuse and deceive the public, prevents it from asserting laches in this case, even if it could prove the defense, which as indicated above, it cannot.

*Cuban Cigar*, 457 F.Supp. at 1099–1100 (footnote omitted).

Second, Ikon has not carried its burden on the elements of a laches defense. The evidence at trial indicated that Nikon did not actually become aware of the usage of the IKON mark until February 1989 when an attorney informed Nikon's in-house counsel of the usage. When Nikon learned about Ikon, it acted promptly by requesting outside trademark counsel to obtain IKON cameras and to investigate the channels of trade through which they traveled. On May 31, 1989, Nikon sent Ikon a cease and desist letter. When Ikon did not heed Nikon's warning, Nikon filed this action in September of 1989.

Ikon's attempt to impute knowledge to Nikon at an earlier time is rejected. Though defendant's mark may have been used in an open and continuous manner, it did not advertise its mark. Further, Elo's testimony that he attended the 1988 and 1989 trade shows where a few of the dozens of individuals connected with Nikon examined IKON products and took brochures, is also an insufficient basis upon which to impute knowledge. Ikon was unable to identify the people from Nikon or provide any evidence from which it could be reasonably inferred that notice to them constituted notice to Nikon.

Finally, Ikon has failed to establish an unclean hands defense based upon Nikon's use of the trademark NIKON SMILETAK-ER. *See Opinion and Order*, dated May 1, 1992, denying Ikon's motion for a preliminary injunction on its counterclaim challenging Nikon's use of this mark.

### Dilution

Ikon's motion to dismiss Nikon's dilution claim was denied before trial. The reason for that denial follows.

■■■ Ikon's motion has two bases: first, Ikon argues that New York's anti-dilution statute, N.Y.Gen.Bus.L. § 368–d, is preempted by the Lanham Act and must be stricken insofar as it is inconsistent with the Act; Second, Ikon argues that New York's anti-dilution statute only applies to non-competing goods and therefore is not applicable here.

Ikon bases its preemption argument primarily on the district court decision in *United States Jaycees v. Commodities Magazine, Inc.*, 661 F.Supp. 1360, 1367 (N.D.Iowa 1987), which held that Iowa's anti-dilution statute was preempted by the Lanham Act because it interfered with an objective of the Act, namely, the objective of providing trademark holders with uniform and definite rights. The Court reasoned:

> In providing greater rights to holders of trademarks than are available ... under the Lanham Act, Iowa Code § 548.11 and other various state dilution statutes frustrate "... the accomplishment and execution of the full purposes and objective of Congress," *Hines v. Davidowitz*, 312 U.S. 52 [61 S.Ct. 399, 85 L.Ed. 581] ... (1941), by supplanting the uniform and definite rights contained in the Lanham Act, which are intended for those who trade in interstate commerce, with a checkerboard of differing rights.

*Id.* at 1367–68. Ikon argues that New York's anti-dilution statute similarly frustrates the purpose of the Lanham Act by providing greater rights to trademark holders and, thereby, prohibits the use of marks that would be lawful under the Lanham Act in interstate commerce.

Courts in this circuit which have addressed preemption of New York's anti-

dilution law by the Lanham Act have expressly declined to follow *Jaycees* and the other cases relied on by Ikon. In *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 702 F.Supp. 1031, 1040 (S.D.N.Y.1988), *rev'd on other grounds,* 875 F.2d 1026 (2d Cir.1989), the Court stated that the "continuing validity of the Eighth Circuit's preemption law as enunciated in *Sargent [& Co. v. Welco Feed Mfg. Co.,* 195 F.2d 929 (8th Cir.1952),] and as reiterated in *Comidas Exquisitos [, Inc. v. Carlos McGee's Mexican Cafe, Inc.,* 602 F.Supp. 191 (S.D.Iowa), *aff'd sub nom., Comidas Exquisitos Inc. v. O'Malley & McGee's Inc.,* 775 F.2d 260 (8th Cir.1985),] and *Jaycees* has been questioned." The Court declined to follow these decisions, holding:

> The basic purpose of the Lanham Act is to protect trademark holders and the public.... New York's anti-dilution statute simply provided greater rights than its federal counterpart. To the extent that the New York statute protects rights not provided for by the federal statute, it does not conflict with the Lanham Act but rather, it complements and supplements it. This court finds persuasive the Third Circuit's analysis [in *Mariniello v. Shell Oil Co.,* 511 F.2d 853 (3d Cir.1975),] of the extent to which the Lanham Act preempts state antidilution statutes, namely, that state law is only preempted to the extent it permits behavior outlawed by the law.... Accordingly, the court holds that the Lanham Act does not preempt New York's antidilution statute.

*Id.* at 1041 (citations omitted); *accord LeSportsac, Inc. v. K Mart Corp.,* 617 F.Supp. 316, 318 (E.D.N.Y.1985); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 467 F.Supp. 366, 378 (S.D.N.Y.), *aff'd,* 604 F.2d 200 (2d Cir.1979). Thus, contrary to Ikon's theory of preemption, New York's anti-dilution statute is not preempted precisely because it provides trademark holders with broader rights than permitted under the Lanham Act. *See also Golden Door, Inc. v. Odisho,* 646 F.2d 347, 352 (9th Cir.1980); *Keebler Co. v. Rovira*

*Biscuit Corp.,* 624 F.2d 366, 372 n. 3 (1st Cir.1980).

█ Ikon also argues that Nikon's dilution claim should be dismissed because New York's anti-dilution statute applies only where the allegedly infringing mark is used on products not in competition with the senior user's mark, which is not the case at hand. This argument is also rejected.

New York's anti-dilution statute provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, *notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.*

N.Y.Gen.Bus.L. § 368–d (emphasis added). In *Sally Gee,* 699 F.2d at 625, the Court of Appeals for the Second Circuit held that the only elements necessary for a dilution claim under Section 368–d are the possession of a truly distinctive trademark and likelihood of dilution, "characterized as a 'whittling down' of the identity or reputation of a tradename or mark." *Accord Mead Data Cent., Inc. v. Toyota Motor Sales,* 875 F.2d 1026, 1029 (2d Cir.1989). The Court of Appeals relied on *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977), in rejecting the District Court's view that both confusion and competition must be shown to succeed under Section 368–d. *Sally Gee,* 699 F.2d at 625. The New York Court of Appeals in *Allied Maintenance* had held that the statute was intended to extend protection to trademarks beyond that provided by actions for infringement and unfair competition and that, in accordance with the terms of the statute, neither a likelihood of confusion nor competition need be shown. *Allied Maintenance,* 42 N.Y.2d at 544–45, 399 N.Y.S.2d 628, 369 N.E.2d 1162.

Ikon argues that *Allied Maintenance* requires that the products at issue be noncompeting. This argument is without merit. Section 368–d has been applied in many

cases in this Circuit where the marks involved were used on competing products. *E.g., E.P. Lehmann Co. v. Polk's Model-craft Hobbies, Inc.,* 770 F.Supp. 202, 205 (S.D.N.Y.1991); *Sage Realty Corp. v. Sage Group, Inc.,* 711 F.Supp. 134, 142 (S.D.N.Y.1989); *Frito–Lay, Inc. v. Bachman Co.,* 704 F.Supp. 432, 437–38 (S.D.N.Y.1989); *McDonald's Corp. v. McBagel's, Inc.,* 649 F.Supp. 1268, 1280 (S.D.N.Y.1986); *LeSportsac, Inc.,* 617 F.Supp. at 317; *Vitabiotics, Ltd. v. Krupka,* 606 F.Supp. 779, 784–85 (E.D.N.Y. 1984); *Baskin–Robbins Ice Cream Co. v. D & L Ice Cream Co., Inc.,* 576 F.Supp. 1055, 1060 (E.D.N.Y.1983); *Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.,* 559 F.Supp. 1189, 1198, 1206–08 (E.D.N.Y. 1983). As the Court in *E.P. Lehmann* explained,

> *Allied* did not hold or state that the statute is inapplicable to cases involving products in direct competition.... Though the dictum in *Allied* is instructive as to the ultimate legislative purpose underlying § 368–d, it does not make the absence of competition a requirement for relief.

770 F.Supp. at 205–06; *accord Frito–Lay, Inc. v. Bachman Co.,* 704 F.Supp. at 437– 38. Significantly, the New York Court of Appeals in *Allied Maintenance* noted, in discussing judicial hesitancy to apply the literal meaning of anti-dilution statutes, "In Illinois, for example, some courts have gone so far as to declare the statute inapplicable where the parties are competitors and a likelihood of confusion does exist." *Allied Maintenance,* 42 N.Y.2d at 544, 399 N.Y.S.2d 628, 369 N.E.2d 1162. The Court went on to note, in apparent approval, that other courts have accepted the plain meaning of the anti-dilution statutes. *See id.* In short, the statute, when construed in terms of its plain meaning, applies to competitors as well as non-competitors.[6]

To establish dilution, plaintiff must demonstrate that 1) it possesses an "extremely strong mark—either because of the mark's distinctive quality or because it has acquired secondary meaning—and 2) a likelihood of dilution" by defendant's mark. *Pristine Industries, Inc. v. Hallmark Cards, Inc.,* 753 F.Supp. 140, 147 (S.D.N.Y. 1990); *accord Mead Data v. Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1026, 1030–31 (1989); *Sally Gee,* 699 F.2d at 625. Applying the anti-dilution statute to the facts at bar, it is clear that defendant's mark dilutes plaintiff's mark.

"Courts applying the Anti–Dilution Statute have likened its distinctiveness requirement to the strength of a mark requirement for trademark infringement purposes." *Sterling Drug Inc. v. Bayer AG,* 792 F.Supp. 1357, 1375 (S.D.N.Y.1992). NIKON is not only a completely arbitrary mark but it has taken on secondary meaning within the marketplace. NIKON is an extremely strong, world famous trademark for cameras.

To prove likelihood of dilution, plaintiff must demonstrate "either that the defendant's use of the mark tends to blur a mark's product identification or that it tarnishes the affirmative associations a mark has come to convey." *Id.* The following factors are relevant in considering the likelihood of dilution: 1) similarity of the marks; 2) similarity of the products; 3) sophistication of the consumers; 4) predatory intent; 5) renown of the senior mark; and 6) renown of the junior mark. *Mead Data,* 875 F.2d at 1035 (Sweet, J., concurring); *Pristine,* 753 F.Supp. at 147–48. The first five factors have been examined at length above. Briefly, the marks involved here are very similar; they are both used on cameras, some models of which are in direct competition with each other; a

---

**6.** Ikon relies on cases in this district which interpreted *Allied Maintenance* as requiring non-competition. *See, e.g., Weight Watchers Int'l, Inc. v. Stouffer Corp.,* 744 F.Supp. 1259, 1284 (S.D.N.Y.1990); *Franklin Electronic Publishers, Inc. v. Unisonic Products Corp.,* 763 F.Supp. 1, 5 (S.D.N.Y.1991); *Business Trends Analysts v. Freedonia Group, Inc.,* 650 F.Supp.

1452, 1458 (S.D.N.Y.1987); *Aris–Isotoner Gloves, Inc. v. Fownes Bros. & Co., Inc.,* 594 F.Supp. 15, 24 (S.D.N.Y.1983). As the Second Circuit has recently noted, without deciding the issue, there is a split among the district courts in this Circuit. *Bristol–Myers Squibb v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1049 (2d Cir.1992).

significant portion of each product's consumers are unsophisticated; NIKON is, as defendant has conceded, a world renowned trademark; and Ikon's selection of its name was not in good faith, but rather selected with the intent of associating itself with the fame and goodwill of the NIKON mark. The sixth factor, not discussed previously, is the renown of the junior mark. IKON is not a famous mark. Ikon has done no advertising and little promotion of its product to the consuming public. While the name IKON is known among camera dealers, it cannot be compared to the fame of NIKON. All of the above factors weigh in plaintiff's favor, and I find that IKON is likely to tarnish or blur the identity and reputation of the NIKON mark.

### *Attorney's Fees*

Nikon seeks an award of attorney's fees under 15 U.S.C. § 1117(a) which provides: "The court in exceptional cases may award reasonable attorney fees to the prevailing party."

Preliminarily, Ikon argues that Nikon's withdrawal of its claim for damages, in order to eliminate the necessity of a jury trial, necessarily amounted to a waiver of attorney's fees as well. This argument is without merit, since an award of attorney's fees under the statute is equitable in nature and is to be decided by the court, and not by a jury. Ikon relies, in addition, on a sentence in a letter to the court from plaintiff's counsel addressing the jury trial issue. That sentence states, "Plaintiff now has dropped all of its claims for relief except for injunctive relief." Ikon argues, on the basis of this sentence, that Nikon waived any request for attorney's fees. The proceedings in this case do not support this interpretation of the sentence. When understood in context of the parties' arguments regarding the availability of a jury trial, and where no mention of attorney's fees had been had, it is clear that Nikon was not intending to waive attorney's fees.

However, Nikon's application is denied, for this is not an "exceptional" case calling for attorney's fees. While, in evalu-

ating the *Polaroid* factors, Ikon has been found to have acted in bad faith, and while bad faith is undoubtedly essential to a finding of exceptional circumstances, a finding of bad faith does not in itself call for the award of attorney's fees. While the defendant sought to trade on plaintiff's valuable mark, and "snuggled" too close to it, this is not an exceptional case. *Cf. Centaur Communications Ltd. v. A/S/M Communications, Inc.*, 652 F.Supp. 1105, 1114–15 (S.D.N.Y.), *aff'd*, 830 F.2d 1217 (2d Cir. 1987) (award of attorney's fees made where defendant was found to have "deliberately and knowingly misappropriated" the identical mark used by plaintiff).

### CONCLUSION

Nikon is entitled to injunctive relief. The parties are invited to confer on a judgment. If a judgment cannot be agreed upon, plaintiff is to submit a proposed judgment on notice no later than October 16, 1992.

SO ORDERED.