**TRI–STAR PICTURES, INC., Plaintiff,**

v.

**Kurt UNGER, Leisure Time Productions, B.V., Academy Pictures, A.G., and David N. Bottoms and Hon. Raya S. Dreben as Executors of the Estate of Samuel Spiegel, Defendants.**

**LEISURE TIME PRODUCTIONS, B.V., Third–Party Plaintiff,**

v.

**COLUMBIA PICTURES INDUSTRIES, INC., Columbia Pictures Entertainment, Inc. and Horizon Pictures, G.B., Third–Party Defendants.**

No. 88 Civ. 9129(DNE).

United States District Court,
S.D. New York.

July 13, 1998.

Ira S. Sacks, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Plaintiffs.

Jay Cohen, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, William J. Davis, New York City, Allan Zelnick, Richard Lehv, Weiss Dawid, Fross, Zelnick & Lehrman, P.C., New York City, for Defendants.

Jay Cohen, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, William J. Davis, for Third–party Defendants.

Ira S. Sacks, Fried, Frank, Harris, Shriver & Jacobson, for Third–Party Defendants.

*OPINION & ORDER*

EDELSTEIN, District Judge.

Plaintiffs Columbia Pictures Industries, Inc. ("Columbia") and Academy Pictures A.G. ("Academy") (collectively, "Plaintiffs") brought this action for trademark infringement, unfair competition, dilution and injury to business reputation pursuant to 15 U.S.C. § 1125, Section 360–*l* of the New York Gen-

eral Business Law, New York Law and the common law against Defendants Leisure Time Productions, B.V. ("Leisure Time") and Kurt Unger ("Unger") (collectively, "Defendants"), in an attempt to permanently enjoin Leisure Time and Unger from releasing, distributing or advertising in the United States, their produced, but unreleased, motion picture entitled "Return from the River Kwai" ("Return") with that title or with any other title containing the words "River Kwai" or any other confusingly similar titles. The case was tried as a bench trial from July 14–16, 1997. Subsequent to the trial, both parties submitted Proposed Findings of Fact and Conclusions of Law and Post Trial Memoranda.

### *Background*

"Bridge on the River Kwai" ("Bridge") was produced in 1956 by Sam Spiegel through two corporations he controlled, Horizon–American Pictures, Inc. ("Horizon–American") and Horizon Pictures Ltd. ("Horizon G.B."). Stipulated Fact ("Stip.Fact") 5.2.1. On April 18, 1956, Albatros Trust ("Albatros"), the predecessor of Plaintiff Academy, entered into an agreement with Horizon–American in which Albatros obtained a 25% royalty interest in revenues generated by the distribution of Bridge in the Western Hemisphere, excluding the United States and Canada. Stip.Fact 5.2.2. An April 25, 1956 distribution agreement gave a predecessor to Columbia [1] the rights to distribute the film in the Western Hemisphere. Stip.Fact 5.2.3. In addition, pursuant to the April 25, 1956 distribution agreement, Horizon–American agreed to obtain the copyrights in Bridge in the Western Hemisphere from Horizon G.B. and assign them to Columbia, while Columbia agreed to hold said copyrights in trust for the joint benefit of Columbia and Horizon–American. Stip.Fact 5.2.4; 5.2.5. Columbia distributed Bridge in the United States, releasing it in 1957 to critical and public acclaim. Stip.Fact 5.3.3. It won several Academy awards, and has since been viewed by millions of people in the United States and abroad. Stip.Fact 5.3.4.

As per the April 25, 1956 agreement, Horizon Pictures, Inc. ("Horizon"), successor to Horizon–American, on January 5, 1959, assigned all right, title and interest of Bridge in the Western Hemisphere to Columbia subject to the already existing rights of Albatros created by the 1956 royalty agreement. Stip. 5.2.6. Subsequently, on February 5, 1959, Columbia entered into an agreement with Albatros to settle existing claims for overdue royalties. This agreement increased Albatros' royalty rates from 25% to 50% of the profits generated by Bridge, plus one half percent of the gross proceeds from the entire Western Hemisphere. Stip. 5.2.7. Albatros, for its part, agreed not to sue Columbia for claims relating to Bridge except for claims arising out of its rights under the agreement, including royalty payments. Stip.Fact 5.2.8.

On April 28, 1960, Albatros entered into an agreement with a predecessor to Academy whereby Albatros assigned its rights to Western Hemisphere profits and proceeds to the predecessor of Academy for $590,000. Stip.Fact 5.2.9. Thus, both Columbia and Academy own interests in Bridge. Indeed, Columbia still regularly remits to Academy payment representing Academy's share of proceeds resulting from the distribution of Bridge in the Western Hemisphere. Stip. Fact 5.2.12.

In early 1978, Defendant Unger became aware that Joan and Clay Blair, Jr. were writing a non-fiction book concerning some experiences of Allied prisoners of war held by the Japanese in the late stages of World War II. Stip.Fact 5.6.1. Specifically, the Blairs' book pertained to some of the Allied prisoners who were forced to build a Japanese railway through the jungles of Burma and Thailand, and were subsequently to be shipped to Japan to help alleviate a shortage of labor in Japan's mines and war production factories. Stip.Fact 5.6.2.

Unger considered the Blairs' book a possible sequel to Bridge. Stip.Fact 5.6.3. Indeed, when Unger first approached the Blairs' agent, he asked if Sam Spiegel, whom Unger considered the "natural" person to produce a motion picture based on the Blairs' book, was interested in the rights to their

---

**1.** Hereinafter, the predecessor to Columbia shall also be referred to as Columbia.

book. Stip.Fact 5.6.4. Upon learning that Mr. Spiegel was not interested in the rights to the Blairs' book, Unger and his company Screenlife Establishment ("Screenlife"), on April 20, 1978, secured an option to purchase the motion picture and television rights to the Blairs' book, then, tentatively named, "Return from the River Kwai." Stip.Fact 5.6.5. After completing the book, the Blairs, pursuant to an agreement dated July 24, 1978, assigned certain rights in the book to Screenlife. Stip.Fact 5.6.7. In a separate agreement dated the same day, Screenlife employed the Blairs to write a screenplay, based on their book, for a motion picture Screenlife planned to produce. Stip.Fact 5.6.7.

In discussions about the initial screenplay for the motion picture Return, Unger and the Blairs contemplated a "story link" between the motion picture Bridge and the screenplay for Return. Stip.Fact 5.6.9; Trial Transcript ("Tr.") at 122–23. In fact, in the Blairs' first draft of the story line for Return, there were several links to Bridge that were not in the Blairs' book. Tr. at 123–24. For instance, the draft included using "The Colonel Bogey March," the tune the prisoners whistled in Bridge, on three separate occasions. Tr. at 124–25. Additionally, the beginning of the initial draft refers to the final scene from Bridge in that it had the prisoners hearing an explosion and shouting "[t]hey blew up the bridge! The bridge and the train!." Tr. at 125.

At this time, Unger allegedly considered that Return would be a sequel to Bridge. Indeed, he intended to open Return with a film clip of the last few minutes from Bridge,[2] expecting that people would probably recognize the clip as being from Bridge. Tr. at 126–27.

In May 1978, after acquiring the option to purchase the motion picture and television rights to the Blairs' book, and pursuant to a set of Motion Picture Association of America,

Inc. "MPAA" rules which requires its members to register the prospective titles of movies they plan to release, Leisure Time, using its trade name "The Film Pact," registered the title "Return from the River Kwai" with the Title Registration Bureau of the MPAA. Stip.Fact 5.7.1. Leisure Time's registration of the title Return was listed in the MPAA's daily Title Registration Report on May 9, 1978.[3] Id.

Under the MPAA's rules, any member with a complaint of a registered title could file a protest within seven days of receiving notice of the registration. Stip.Fact 5.7.4. Columbia protested the registration of Return on the ground of harmful similarity to the title Bridge. Stip.Fact 5.7.5. However, the protest was not considered by the MPAA because it was received after the seven day time limit. Defendants allege that they spent over $500,000 in preproduction costs from 1978 to 1984, Tr. at 179–180, including approximately $10,000 advanced to them from Columbia. Stip.Fact 5.8.5.

In late 1983 and early 1984, Unger entered into negotiations with Columbia to distribute Return outside the United States and Canada. Stip.Fact 5.8.1. During the course of these negotiations, Columbia stated that before entering into an agreement with Leisure Time to distribute Return, Unger first needed to obtain permission or a waiver from the producer of Bridge to use the title Return. Defendants' Exhibit ("Defs.Ex.") 108. Unger, by counsel, responded that Horizon's consent of his title was not required, as the words "River Kwai" denoted an actual geographical area and thus were available for use by anyone as long as the rest of the title did not make the two titles confusingly similar. Defs.Ex. 112. On March 20, 1985, Columbia terminated its negotiations with Leisure Time for acquiring the foreign distributions rights to Return. Defs.Ex. 122.

On July 23, 1986, Tri–Star and Leisure Time entered into a distribution agreement

---

2. Around 1980–1981, Unger directed David White, one of his employees, to ask Horizon for permission to use the last few minutes of Bridge in the motion picture that Unger was planning. Tr. at 130–31.

3. The MPAA's daily title registration service is mailed to all subscribers of their service. Both Columbia, as a member, and Horizon, as a non-member, subscribed to this service. However, there is no evidence that Academy subscribed to this service.

whereby Leisure Time granted Tri–Star exclusive distribution rights for Return in the United States and Canada. Plaintiffs' Exhibit ("Pls.Ex.") 104; Stip.Fact 5.9.1. Pursuant to the distribution agreement, Leisure Time represented and warranted that it would provide Return for distribution free of any claims that "can or will impair or interfere with the rights of Tri–Star." Pls.Ex. 104; Stip.Fact 5.9.3. Additionally, the distribution agreement provided for the termination upon Leisure Time's breach of any warranty which materially affected Tri–Star's rights thereunder. Pls.Ex. 104; Stip. Fact 5.9.5. Further, Leisure Time represented and warranted that Return would not violate or infringe upon the Trademark of another party. Pls.Ex. 104; Stip.Fact 5.9.4.

In July, 1987, Tri–Star registered the title Return with the Title registration Bureau of the MPAA. The registration was listed in the MPAA's Title Report dated July 2, 1987. Stip.Fact 5.7.8; Pls.Ex. 111. Thereafter, on July 13, 1987, Unger asked Tri–Star to withdraw its registration of Return. Pls.Ex. 112. However, before Tri–Star was able to do so, Columbia protested the registration. Pls.Ex. 111. Its protest was reported in the MPAA Title Report dated July 14, 1987. Pls.Ex. 111. The Title Report stated that the title Return "will not be clear for the registrant's use, under the provision of the Title Memorandum, until such time as the protest has been resolved ..." Pls.Ex. 111; Tr. at 241. The protest was never resolved.

Nevertheless, Columbia persisted with its objections to the use of the title Return. By letters dated June 15, 1987, August 10, 1987 and August 11, 1987, Columbia informed Unger that use of the title Return infringed on Columbia's and Horizon's right in Bridge and potentially violated trademark and unfair competition statutes. Stip.Facts 5.9.7; 5.9.8; 5.9.9. Columbia insisted that Unger cease and desist from any further use of the name Return, and threatened that continued use of the title would be to his peril. Thereafter, on December 17, 1987, Tri–Star and Columbia became affiliates and Columbia suspended asserting its claim against Return. Stip.Fact 5.9.10.

Tri–Star, after learning that Return had begun shooting in February, 1988, and upon learning of the dispute between Unger and Columbia over the title Return to avoid any potential liability. Stip.Fact 5.10.4. In the fall of 1988, Leisure Time offered to change Return's title to "March From the River Kwai" and to add a disclaimer disassociating the motion picture from Bridge. Defs.Exs. 176, 180; Stip.Fact 5.10.5. This offer, however, was rejected by Academy. Moreover, Academy, by letter dated November 17, 1988, advised Columbia that any use of the name "River Kwai" in a movie title would be met with a lawsuit to protect Academy's rights in the title, and that Columbia and Tri–Star would be joined as defendants in such a suit. Pls.Ex. 134; Stip.Fact 5.10.7.

In light of Academy's threat to include Tri–Star and Columbia in the lawsuit to protect Academy's rights in Bridge, Tri–Star, by letter dated December 5, 1988, informed Leisure Time of Academy's trademark infringement claim. Pls.Ex. 135; Stip.Fact 5.10.10. Tri–Star stated that, because of Academy's claim, Tri–Star considered Leisure Time in breach of its warranty to deliver the movie free from claims against it and therefore considered itself free to terminate the Distribution Agreement if the breach was not cured within 10 days. Pls.Ex. 135; Stip.Fact 5.10.11. In response, Leisure Time threatened to sue for breach of contract if Tri–Star terminated the agreement. On December 27, 1988, this lawsuit as well as the companion contract action were commenced by Tri–Star.

In an opinion dated October 15, 1990, this Court found that by adopting and retaining the title Return, Leisure Time had breached an express warranty in the Distribution Agreement that Return would not violate or infringe upon the trademark of another party. *See Tri–Star v. Leisure Time*, 749 F.Supp. 1243 (S.D.N.Y.1990), *aff'd*, 17 F.3d 38 (2d Cir.1994). This Court thus granted Tri–Star summary judgment, holding that, in light of Academy's assertion of trademark rights in the term "River Kwai," Tri–Star was entitled to terminate the Distribution Agreement. *See id.* This Court, however, denied Academy's motion for summary judg-

ment against Leisure Time on the companion trademark infringement claim because disputed issues of material fact lingered as to the secondary meaning and the strength of the "River Kwai" mark and as to laches. *See id.*

The trial as to the questions of material fact occurred in July, 1997. Plaintiffs alleged that the release, distribution or advertising of Return would infringe on their trademarks in the title Bridge and in the words "River Kwai" when used in the title of a motion picture. Specifically, Plaintiffs claimed that Leisure Time and Unger would be unjustly enriched if they are permitted to release its film with the current title because it will mislead the public into believing that Return is actually Bridge or is a remake or sequel to Bridge. They charge that Leisure Time wishes to release Return with its current title solely for the purpose of confusing the public as to the film's origin, i.e., by implying that it is a sequel to Bridge and/or was produced or sponsored by the producers of Bridge and is of the same high caliber as Bridge, in order to prolong the life and to increase the revenues of their film.

In support of their claims, Plaintiffs argue that the motion picture title Bridge, and the term "River Kwai" (collectively the "marks") when used in the title of a motion picture have each acquired secondary meaning and thus are entitled to protection under the Lanham Act. Plaintiffs' Post–Trial Memorandum of Law ("Pls.Brief") at 4. In addition, Plaintiffs claim that the title Return is likely to cause confusion among motion pictures viewers as to the source of the motion picture such that the release of Return with that title would infringe Plaintiffs' rights under the Lanham Act and under state statutory and common law. *Id.* at 13–14.

Defendants contest Plaintiffs' claims by arguing that the term "River Kwai" is not entitled to trademark protection. Post Trial Memorandum of Defendants Kurt Unger and Leisure Time Productions, B.V. ("Defs.Brief") at 3. Additionally, Defendants contend that Plaintiffs' evidence does not establish a likelihood of confusion between Bridge and Return. *Id.* at 14. Moreover, Defendants argue that because Plaintiffs un-

reasonably delayed in asserting their infringement claim against Defendants, Plaintiffs' action is barred by laches. *Id.* at 26.

Plaintiffs attempt to rebut Defendants' laches argument by stating that Defendants have not demonstrated that Plaintiffs improperly delayed in taking action against Defendants' plan to use the title Return. Pls. Brief at 29. In addition, Plaintiffs suggest that even if this Court finds that they did improperly delay in taking action, that Defendants have not proven that they were harmed or prejudiced by the delay. *Id.* at 26. Furthermore, Plaintiffs contend that Defendants' impermissible delay argument is not even available here because Defendants have deliberately attempted to infringe Plaintiffs' marks. *Id.* at 35.

### *Discussion*

■ Section 43(a) of the Lanham Act prohibits any person from using "in connection with any goods ... any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin, sponsorship, or approval of ... his or her goods ... by another person." 15 U.S.C. § 1125(a)(1). The purpose of § 43(a) is to prevent consumer confusion as to the source of a product and to enable those that produce a product to differentiate it from others on the market. *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1220 (2d Cir.1987) (citations omitted); *Mechanical Plastics Corp. v. Titan Technologies, Inc.,* 823 F.Supp. 1137, 1143 (S.D.N.Y. 1993) *aff'd* 33 F.3d 50 (2d Cir.1994).

■ Section 43(a) has been "broadly construed to provide protection against deceptive marking, packaging, and advertising of goods and services in commerce." *20th Century Wear, Inc. v. Sanmark–Stardust,* 747 F.2d 81, 91 (2d Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1755, 84 L.Ed.2d 818 (1985) (citing *Keebler Co. v. Rovira Biscuit Corp.,* 624 F.2d 366, 372 (1st Cir.1980)). Indeed, even unregistered trademarks are protected under § 43(a). *Paddington Corp. v. Attiki Importers & Distributors, Inc.,* 996 F.2d 577, 582 (2d Cir.1993). This includes motion picture titles as they are sold in the

commercial marketplace where the danger of consumer deception is a legitimate concern. *See Rogers v. Grimaldi*, 875 F.2d 994, 997–98 (2d Cir.1989) (stating that it is well established that where a motion picture title has acquired secondary meaning it is entitled trademark protection under § 43(a) of the Lanham Act); *Tri–Star Pictures, Inc. v. Leisure Time Productions, B.V.*, 17 F.3d 38, 43 (2d Cir.), *cert. denied*, 513 U.S. 987, 115 S.Ct. 484, 130 L.Ed.2d 396 (1994); *Orion Pictures Co. Inc. v. Dell Publishing Co. Inc.*, 471 F.Supp. 392, 395 (S.D.N.Y.1979).

■ In order to prevail on a trademark infringement claim, Plaintiffs must demonstrate that their marks are valid trademarks entitled to protection under the Lanham Act, *and* that Defendants' actions are likely to cause confusion with Plaintiffs' marks. *See The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir.1996); *Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir.1993). This Court will begin with the first step of this two part analysis, whether Plaintiffs' marks merit protection.

*Secondary Meaning Analysis*

■■ Generally, a mark receives trademark protection when it acquires secondary meaning.[4] *See Gruner*, 991 F.2d at 1076. Secondary meaning ordinarily attaches to a mark when " 'the mark comes to identify not only the goods, but the source of those goods,' " *Centaur Communications*, 830 F.2d at 1221 (quoting *20th Century Wear, Inc. v. Sanmark–Stardust* 815 F.2d 8, 10 (2d Cir. 1987)), or when "the consuming public primarily associates the term with a particular source." *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1509 (2d Cir.1997) (quoting *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1040 (2d Cir.1992)).

■ Motion picture titles are no different. As this Court has previously stated, motion picture titles acquire secondary meaning when the title becomes so well known that consumers associate it with a

particular author's work. *Tri–Star*, 749 F.Supp. at 1252. *See Orion Pictures*, 471 F.Supp. at 395 (stating that a motion picture title acquires secondary meaning where "through publicity and use, [the title] has come to be associated in the minds of a substantial number of people with a certain type of film produced by a particular individual"). Once a motion picture title acquires secondary meaning, the owner of the rights to that title, or mark, may prevent the use of the same or confusingly similar titles by others. *Rogers*, 875 F.2d at 998.

■ Although secondary meaning analyses focus on the consuming public, every consumer need not make the required association. It is sufficient to demonstrate that a substantial segment of the relevant consumer group makes the requisite association. *Centaur Communications*, 830 F.2d at 1221–22; *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 168 (2d Cir.1991).

■ In ascertaining whether a mark has obtained secondary meaning, a court should look to the following factors: (1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) unsolicited media coverage of the product; (4) sales success; (5) attempts to plagiarize the mark and (6) length and exclusivity of the mark's use. *Centaur Communications*, 830 F.2d at 1222; *Thompson Medical Co. v. Pfizer, Inc.*, 753 F.2d 208, 217 (2d Cir.1985); *see L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co., Inc.*, 79 F.3d 258, 263 (2d Cir.1996); *Black & Decker Corporation v. Dunsford*, 944 F.Supp. 220, 226 (S.D.N.Y.1996). None of the above factors alone is dispositive in determining secondary meaning, nor is it necessary for a party to prove every element. *Centaur Communications*, 830 F.2d at 1222; *Thompson Medical Co. v. Pfizer, Inc.*, 753 F.2d at 217; *L. & J.G. Stickley, Inc.*, 79 F.3d at 263. Nevertheless, this Court shall consider each factor in turn in making its determination of whether Plaintiffs have established secondary meaning.

---

4. Secondary meaning refers to the protection given to geographic or descriptive terms that a producer has used to such an extent as to lead the general public to identify the mark to the producer, thus permitting producers to protect an otherwise unprotectable mark. *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 441 F.Supp. 1220, 1226 n. 25 (1977) (citations omitted).

First, extensive advertising expenditures and publicity by the holder of the mark are probative in assessing whether a mark has acquired secondary meaning. *See Centaur Communications,* 830 F.2d at 1222; *Thompson Medical Co.,* 753 F.2d at 217; *Harlequin Enterprises Ltd. v. Gulf & Western Corp.,* 644 F.2d 946, 949–50 (2d Cir.1981). Here, the evidence sets forth that since 1977 Plaintiffs' pure advertising expenditures have only amounted to approximately $27,358.[5] *See* Pls.Exs. 170–196I. Plaintiffs recognize that this is a modest amount but contend that given the success and popularity of Bridge that substantial advertising expenditures would have been illogical. *See* Plaintiffs' Memorandum in Response to Post–Trial Memorandum of Defendants Kurt Unger and Leisure Time Productions, B.V. ("Plaintiffs' Response") at 18. Although this Court is intrigued by this argument, Plaintiffs cite no cases to support their notion that a purposeful lack of advertising satisfies the advertising expenditures inquiry, and this Court's research has found no such authority. Accordingly, this Court holds that Plaintiffs have not met their burden with regards to this element and thus cannot rely on this element to support their claim of secondary meaning. This, however, does not end the inquiry because, as stated, no one factor is dispositive in determining secondary meaning and every element need not be proved. *Centaur Communications,* 830 F.2d at 1222; *Thompson Medical Co.,* 753 F.2d at 217; *L. & J.G. Stickley, Inc.,* 79 F.3d at 263.

Second, consumer studies linking the mark to the source can be indicative of secondary meaning. *See Harlequin Enterprises Ltd.,* 644 F.2d at 950 n. 2; *Ideal Toy Corp. v. Chinese Arts & Crafts Inc.,* 530 F.Supp. 375, 380 (S.D.N.Y.1981). A consumer survey, conducted by Dr. Eugene Ericksen, concluded that the words "River Kwai," in connection with the title of a motion picture, have achieved secondary meaning among a large segment of the American movie-going public. *See* Pls.Ex. 232. Indeed, out of 200 people interviewed in Dr. Ericksen's telephone survey, 42% of all respondents had heard of or seen a motion picture with the words "River Kwai" in the title. *Id.* at 6. Seventy-four percent of those respondents identified that motion picture as Bridge. *Id.* Dr. Ericksen's mall survey of 100 people disclosed that 51% of all respondents had heard of or seen a motion picture with the words "River Kwai" in the title. *Id.,* Table 8. Again, approximately 73% of those respondents gave a description of Bridge. Although these numbers are not conclusive evidence of secondary meaning, they are significant enough to be probative of secondary meaning. *See Harlequin Enterprises Ltd.,* 644 F.2d at 950 n. 2.

Defendants claim that Dr. Ericksen's survey is flawed because it failed to identify the relevant universe or the intended market for Return because his survey excluded young adults aged thirteen through seventeen, an age group that Defendants contend Return would appeal. *See* Defs.Brief at 5–6. However, this argument is unavailing as Dr. Ericksen testified that had he included people aged thirteen to seventeen in his survey and had none of them been confused by the title Return, that would have had only a minor effect on the survey's results. *See* Tr. at 91–93.

Defendants also suggest that Dr. Ericksen's survey is flawed because it posed leading questions to its respondents. *See* Defs. Brief at 6. The question posed by Dr. Ericksen was whether they had ever heard of any motion picture or motion pictures with the words "River Kwai" in the title. Defendants suggest that a better question would have been "with whom or what do you associate 'River Kwai.'" *Id.* Since Plaintiffs claim trademark protection in the title "The Bridge on the River Kwai" and in the words "River Kwai" when used in the title of a motion picture, this Court finds that Dr. Ericksen's question was appropriate. *See* L.E. Evans and D.M. Gunn, *Trademark Surveys,* 79 The Trademark Reporter 1, 16–17 (1989) (quoting V.N. Palladino, *Techniques for Ascertaining*

---

**5.** Plaintiffs argue that this Court should consider manufacturing costs, advertising and other promotional costs in determining Bridge's advertising expenditures total, thereby increasing Plaintiffs' advertising expenditures to approximately $9.3 million since 1957. This argument is baseless and is rejected outright.

*if There is Secondary Meaning*, 73 The Trademark Reporter 391, 397 (1983)) ("[t]he appropriate question in [a secondary meaning] survey is 'Do you associate [claimed trademark] with [product identification] of one, or more than one, company?' "); *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 661 n. 4 (2d Cir.1979). Defendants' suggested question might have been appropriate had Plaintiffs claimed a trademark in the phrase "River Kwai" for any purpose. Here, however, in the context of the narrower trademark claimed by Plaintiffs, Defendants' suggestion is off the mark.

Defendants further object to Dr. Ericksen's survey because they argue that it was not conducted under actual marketing conditions. *See* Defs.Brief at 6. This argument is without merit. Dr. Ericksen conducted a telephone survey and a survey which directed respondents to look at cards with words printed on them. Both types are regularly used by professionals who conduct surveys. *See American Footwear Corp.*, 609 F.2d at 660 n. 4. Additionally, both surveys replicate the real world conditions in which a potential motion picture viewer is likely to encounter a film's title, *i.e.*, by word of mouth or by seeing billboards or listings in newspapers and magazines.

█ Finally, Defendants assert that Dr. Ericksen's survey is flawed because it failed to take into consideration whether the potential respondents were likely to go see Return. *See* Defs.Brief at 6–7. This argument is without merit. It is well established that in order for surveys to be probative and meaningful, they "must rely on potential consumers of the product in question." *Dreyfus Fund Inc. v. Royal Bank of Canada*, 525 F.Supp. 1108, 1116 (S.D.N.Y.1981); *see American Footwear Corp.*, 609 F.2d at 660 n. 4. Defendants assertion amounts to a "likely to purchase the product" test which is a far cry from being a potential consumer of a product. Dr. Ericksen's study relies on individuals who had seen a motion picture within the prior six months. Although his approach

assumes that a good indicator of whether an individual is likely to see a movie in the near future is whether that person has seen a movie in the recent past, this Court is satisfied that Dr. Ericksen's survey properly interviewed potential consumers of the product in question.[6]

While this Court is well aware that the results from secondary meaning surveys are open to criticisms from party opponents including the challenging of survey questions, competing experts and rival studies, such studies are helpful tools in assessing secondary meaning. Although Dr. Ericksen's survey is not perfect, and thus is not conclusive evidence of secondary meaning, this Court finds that Dr. Ericksen's survey establishes some evidence that Plaintiffs' marks have attained secondary meaning.

Third, extensive, unsolicited media coverage of a product is a strong indication that a mark has obtained secondary meaning. *See Harlequin Enterprises Ltd.*, 644 F.2d at 950; *Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1174 (2d Cir.1976); *Stern's Miracle–Gro Products, Inc. v. Shark Products, Inc.*, 823 F.Supp. 1077, 1085 (S.D.N.Y. 1993). Numerous awards and international recognition provide evidence of unsolicited media coverage. *PAF S.r.l v. Lisa Lighting Co., Ltd.*, 712 F.Supp. 394, 405 (S.D.N.Y. 1989).

This Court finds that Bridge has received extensive unsolicited media coverage. Indeed, since its release in 1957, Bridge has been the subject of or referred to in thousands of newspaper and magazine articles, many of which are in mass circulations. Stip.Fact 5.4.1. *See e.g.* Pls.Exs. 103, 143, 147, 151, 152, 153, 156. Defendants claim that Plaintiffs attempt to demonstrate media coverage falls flat for a few reasons. *See* Defs.Brief at 7–8. First, Defendants state that many of the Plaintiffs' articles are old and thus do not demonstrate that "River Kwai" has secondary meaning today. This is simply untrue. The evidence shows that there have been hundreds of articles, pub-

---

6. A better approach might have been to question whether the respondents planned on going to the movies within the next six months as this question stresses a present contemplation of a purchase. *See Universal City Studios v. Nintendo Co., Ltd.*, 746 F.2d 112, 118 (2d Cir.1984); *American Footwear Corp.*, 609 F.2d at 660 n. 4.

lished within the last few years, that refer to Bridge. *See e.g.* Pls.Ex. 215.

Defendants also argue that some of the articles entered into evidence by Plaintiffs to support the media coverage element do not focus on Bridge or even refer to Bridge by name. This argument is unconvincing as it overlooks the fact that most of the thousands of articles in the record focus on Bridge and refer to it by name. Finally, Defendants state that the media coverage claimed by Plaintiffs is not as overwhelming as Plaintiffs suggest because Plaintiffs have mistaken mere mention of Bridge with "media coverage." This argument is unavailing as there is no support for the contention that mere mention or incidental references does not qualify as "media coverage."

In addition to the references in newspaper and magazine articles, Bridge has received vast critical and public acclaim. It was the winner of a variety of awards, including seven Academy Awards. *See* Stip.Facts 5.3.4–5.3.10. In sum, this Court finds that the evidence of substantial unsolicited media coverage of Bridge militates in favor of a finding of secondary meaning. *See Harlequin Enterprises Ltd.*, 644 F.2d at 950.

Fourth, the sales success of a product "may be indicative of whether or not a substantial portion of the purchasing public associates the [mark] with the source of the goods." *Ergotron, Inc. v. Hergo Ergonomic Support Systems, Inc.*, 1996 WL 143903 at *8 (S.D.N.Y. Mar.29, 1996). *See Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1043 (2d Cir.1992). This Court finds that there is significant evidence establishing Bridge's commercial success.[7] Bridge has the reputation of being one of the best motion pictures ever made, and its sales success proves this to be accurate. Adjusted for inflation, Bridge, at the time of trial, was the 58th highest grossing motion picture of all time, Pls.Ex. 199A, with a distributor's gross of over $51 million. Stip.Fact 5.5.2; Pls.Exs. 200, 227. Additionally, Plaintiffs continue to earn substantial revenue from Bridge as it is still offered for distribution and exhibition. Stip.Fact 5.5.4; Tr. at 61; 65–68. This evidence of sales success favors a finding of secondary meaning.

Fifth, attempts to plagiarize a mark is the most persuasive, if not conclusive, factor in favor of finding secondary meaning. *See Centaur Communications*, 830 F.2d at 1224; *20th Century*, 815 F.2d at 10; *Harlequin Enterprises Ltd.*, 644 F.2d at 950; *Simon & Schuster, Inc. v. Dove Audio, Inc.*, 936 F.Supp. 156, 162–63 (S.D.N.Y.1996). The record is replete with evidence that Unger acted in bad faith in choosing the title Return for his motion picture and for refusing to change it in spite of numerous complaints that the title infringed on the rights of Bridge.

For instance, as previously discussed, the record shows that Unger considered the Blairs' book to be a possible sequel to Bridge, and that he planned a "story link" between Bridge and Return.[8] *See supra* at 344. However, Return is not a sequel to bridge, nor does it contain a plot link to Bridge. Neither does it open with a film clip of the last few minutes from Bridge or contain any whistling or playing of "The Colonel Bogey March." Additionally, other than a brief reference to the "River Kwai" contained in a visual effect at the beginning of the movie, the words "River Kwai" never appear in the motion picture, and after the first few minutes, there is not even a river in the movie. Nevertheless, Defendants still insist-

---

7. Defendants argue that the evidence that Plaintiffs proffered here falls short of establishing sales success because the evidence does not address whether Plaintiffs have sufficiently demonstrated the sales success of Bridge today in the market of theatrical distribution. Defs.Brief at 9. This argument is flawed. Sales success is evaluated to determine the recognizability of a product, not to determine whether another's product will be in direct competition with the claimed mark. *Ergotron, Inc. v. Hergo Ergonomic Support Systems, Inc.*, 1996 WL 143903 at *8 (S.D.N.Y. Mar.29, 1996). Additionally, there is nothing in the record that suggests that Return will limit its distribution to theatrical channels and not attempt to enter other markets such as videocassettes and television where it would directly compete with Bridge.

8. In fact, Unger admitted that if permitted, he wanted to begin Return with a film clip of the last scene from Bridge expecting that people would probably recognize the clip as being from Bridge. *See* Tr. at 126–27.

ed on titling their movie "Return from the River Kwai."

This Court sees no legitimate reason, artistic or otherwise, for Defendants to call their motion picture "Return from the River Kwai." Accordingly, this Court finds that Defendants' insistence in using the title Return stems from their desire to trade on the goodwill, fame and reputation of Bridge. This Court's finding of bad faith here is buttressed by the fact that Unger stated that although consumers might believe, incorrectly, that Return is a sequel to Bridge, this fact was of no concern to him. Tr. at 158–59.

Additionally, Defendants' bad faith is demonstrated by his continued insistence in using the title Return even though Plaintiffs had objected to and protested his use of the title Return since 1978. Unger knew that Columbia had protested his proposed title based upon confusion with the title of Bridge as early as May 1978, when Defendants had registered the title with the MPAA. *See supra* at 345. He also knew that Plaintiffs had not abandoned their protest because in the distribution negotiations with Columbia from late 1983 to early 1985, *see supra* at 345–346, and again in a series of correspondence between Columbia and Defendants in 1987, Columbia reiterated its opposition to Defendants' use of the title Return unless permission or a waiver from the producer of Bridge was evidenced. *See supra* at 346. Furthermore, he knew that Columbia would protest Tri–Star's July 1987 registration of the title Return with the Title Registration Bureau of the MPAA, and thus insisted that Tri–Star withdraw the registration. Finally, although he was aware that a timely protest was filed by Columbia at that time, Unger has never made any attempt to resolve the protest.

Moreover, Unger's promotion of Return at the Cannes Film Festival in 1988 is further evidence of his bad faith. There, Unger attempted to associate Return with Bridge by distributing a descriptive brochure of Re-

turn and its background that contained a section that was devoted almost exclusively to Bridge. Pls.Ex. 3; Stip.Fact 5.14.2; Tr. at 146–47. Finally, Return was released in Japan with the title "Bridge on the River Kwai" followed by the roman numeral II.

Defendants attempt to counter the above evidence of bad faith by noting that Unger testified as to four reasons why he chose and has remained insistent on using the title Return. First, the River Kwai "is an historically important place known as a place where people suffered during World War II." Tr. at 231. Second, Return had been released by that title in over 50 countries outside North America. *Id.* Third, the title originates from an award winning book. Fourth, Unger had purchased the rights to the book and had registered the title with the MPAA.

This Court finds that the excuses advanced by Unger for the use of the title Return are baseless, lack good faith and are really nothing more than a *post hoc* attempt by Unger to justify his bad faith conduct.[9] This Court thus concludes that Unger adopted the title Return for the purpose of trading on the goodwill, fame, and reputation of Bridge. *See Nikon, Inc. v. Ikon Corp.,* 803 F.Supp. 910, 925 (S.D.N.Y.1992), *aff'd,* 987 F.2d 91 (2d Cir.1993) (quoting *Cuban Cigar Brands, N.V. v. Upmann, Int'l, Inc.,* 457 F.Supp. 1090, 1099–1100 (S.D.N.Y.1978), *aff'd* 607 F.2d 995 (2d Cir.1979)); *Majestic Drug Co., Inc. v. Olla Beauty Supply, Inc.,* 1997 WL 37955, at \*10 (S.D.N.Y. Jan.31, 1997).

All of this, together with Unger's credibility at trial, where he was evasive, repeatedly impeached by his prior sworn statements, refused to admit or begrudgingly admitted stipulated facts, show Unger's bad faith in using the title Return. Accordingly, this Court finds that Unger acted in bad faith in using the title Return and that this factor is persuasive evidence that Plaintiffs' marks have attained secondary meaning.

---

**9.** This Court notes that Unger's last excuse, the only one worth considering here, is without merit. Although the MPAA informed Unger that his title registration was successful, *see* Defs.Exs. 79, 88, Unger still knew that Plaintiffs objected to use of his title. Additionally, Tri–Star's registra-

tion of Return in 1987 with the MPAA was met with a timely protest by Columbia, and although Defendants were aware that the protest was made, they have yet to attempt to resolve the protest.

The sixth and final element this Court should consider when determining whether a mark has attained secondary meaning is the length and exclusivity of a mark. *See Centaur Communications*, 830 F.2d at 1225. This element is evaluated in light of the nature of the product and its consumers. *Id.* Thus, there is no set period of time that, if reached, will automatically give a mark secondary meaning status. *See id. But see Adjusters Int'l, Inc. v. Public Adjusters Int'l, Inc.*, 1996 WL 492905 at *6 (N.D.N.Y. Aug.27, 1996) (stating that the longer and more exclusive the mark, the more likely it is that the mark has acquired secondary meaning).

Here, Plaintiffs have offered substantial evidence that they have used the marks in question continuously and exclusively since Bridge's release in 1957. However, Defendants argue to the contrary. In support of their argument, Defendants introduced excerpts from 25 publications that allegedly reference the River Kwai, including the Blairs' book "Return from the River Kwai," as well as a videotape of a television program on the Arts & Entertainment network ("A & E") called "Kwai: The True Story." *See* Defs.Brief at 11–14. Defendants also argue that Plaintiffs have never taken any action with respect to any of these and the failure to do so is relevant to this Court's inquiry. *See id.*

▮ Defendants correctly note that the publication of books and articles is relevant to the determination of exclusivity as the use of marks in books and movies can infringe. *See Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1379–80 (2d Cir. 1993). However, the simple establishment of evidence of references to the "River Kwai" that were not inspired by the motion picture

Bridge by no means ends the inquiry into the length and exclusivity factor. Indeed, the significance of third party trademarks hinges entirely on their usage. *Scarves by Vera, Inc.*, 544 F.2d at 1173. Thus, in order for Defendants to prove that the mark was not used exclusively, they must demonstrate that third-party use has undercut Plaintiffs' mark. *Sunenblick v. Harrell*, 895 F.Supp. 616, 627 (S.D.N.Y.1995), *aff'd*, 101 F.3d 684 (2d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 386, 136 L.Ed.2d 303 (1996). This can be achieved by showing that third party use of a mark competes with Plaintiffs' mark, *see id.*, and that third party use of the mark was "well promoted" or that the mark was "recognized by consumers." *Scarves by Vera, Inc.*, 544 F.2d at 1173; *Elizabeth Taylor Cosmetics Co., Inc. v. Annick Goutal, S.A.R.L.*, 673 F.Supp. 1238, 1244 (S.D.N.Y.1987).

This Court is not convinced that the Blairs' book, any of the other 25 publications or the A & E program [10] detracted from the exclusivity of Plaintiffs' marks. There is no evidence that they actually competed with Plaintiffs' marks.[11] Nor is there evidence that there was actual third party use here or that any third party use was well promoted or recognized by consumers. Accordingly, this Court holds that Defendants have not met their burden of establishing non-exclusivity. *See Scarves by Vera, Inc.*, 544 F.2d at 1173–74 (holding that the District Court should not have credited alleged third-party uses of mark where "[t]he record [did] not contain any evidence to support the claim that plaintiff's trademark was weakened by uses of similar marks by third parties").

This Court thus finds that Plaintiffs have exclusively used their marks in an uninterrupted fashion for 40 years. This length and exclusivity favors a finding of secondary

---

**10.** The title of A & E program, "Kwai: the True Story" does not use either of the marks claimed by Plaintiffs. Defendants assert that this is irrelevant to the inquiry here because the distinctive aspect of the phrase "River Kwai" is the word "Kwai." The word "River," they argue, is a nonessential modifier of the term "Kwai." This Court is not convinced. If that was true, Defendants would not have insisted that the term "River" remain in the title as it would have been unnecessary. Further, as noted by this Court on many occasions, Defendants could have avoided

much of this litigation by changing the name of their title to "Return from Kwai." The reason why they elected not to do so is because the word "River" is important to their title and is not the unessential modifier that they now claim.

**11.** Since there is no concrete evidence that Defendants publications actually compete with Plaintiffs' marks, this Court does not consider Plaintiffs' lack of action against these publications relevant to this inquiry.

meaning. *See Stern's Miracle–Gro Products, Inc.*, 823 F.Supp. at 1084 (finding that 41 years of exclusive use supports a finding of secondary meaning).

Plaintiffs have established substantial evidence with respect to most of the factors for determining whether a mark has obtained secondary meaning as set forth by the Second Circuit in *Centaur Communications.* Accordingly, this Court finds that Plaintiffs have met their burden of establishing that their marks have attained secondary meaning.

*Likelihood of Confusion*

By establishing secondary meaning, Plaintiffs have demonstrated that their marks are valid trademarks entitled to protection under the Lanham Act. *See Centaur Communications*, 830 F.2d at 1221. However, this alone does not entitle Plaintiffs to relief under section 43(a) of the Lanham Act. As stated, in order for Plaintiffs to prevail on their claim of trademark infringement, not only must they demonstrate that their marks are valid trademarks entitled to protection, but they must also demonstrate that Defendants actions are likely to cause confusion. *See The Sports Authority*, 89 F.3d at 960; *Gruner + Jahr USA*, 991 F.2d at 1075. The latter part of the analysis focuses on whether the interest has been infringed. *Centaur Communications*, 830 F.2d at 1220.

 In order to satisfy the second part of this test, that the title Return infringes on Plaintiffs' marks, Plaintiffs must show that there is a likelihood of confusion between Return and their marks. This standard does not require the Plaintiffs to prove actual confusion. *See Centaur Communications*, 830 F.2d at 1227; *Trustees of Columbia University v. Columbia/HCA Healthcare Corp.*, 964 F.Supp. 733, 743 (S.D.N.Y.1997). Indeed, to trigger liability under § 43(a) of the Lanham Act, it is sufficient for Plaintiffs to show that "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark." *Gruner + Jahr USA*, 991 F.2d at 1077.

 In order to establish that there is a likelihood of confusion, this Court must look to the following factors set forth by Judge Friendly in *Polaroid Corp. v. Polarad Electronics Corp.*: (1) the strength of Plaintiffs marks; (2) the similarity of Plaintiffs' and Defendants' marks; (3) the competitive proximity of the products; (4) the likelihood that Plaintiffs will "bridge the gap" and offer a product like Defendants; (5) actual confusion between the products; (6) good faith on Defendants part; (7) the quality of Defendants' product; and (8) the sophistication of buyers.[12] 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); *see The Sports Authority, Inc.*, 89 F.3d at 960; *Centaur Communications*, 830 F.2d at 1225. This list is not exhaustive nor is one factor dispositive. *Nikon, Inc.*, 987 F.2d at 94. Additionally, the evaluation of these factors is not a mechanical process whereby the party with the greater amount of elements weighing in its favor wins. *Paddington Corp.*, 996 F.2d at 584. "Instead, each factor must be considered in the context of the others, and balanced to determine whether a likelihood of confusion exists." *Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 580 (2d Cir.1991).

 First, the strength of a mark refers to its distinctiveness, or its tendency to identify the goods as emanating from a particular source, even when the source is unknown to the consumer. *Centaur Communications*, 830 F.2d at 1225–26; *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1130 (2d Cir.1979). In determining the strength of a mark, courts should look to the mark's commercial context. *See Centaur Communica-*

---

12. It is well-established that in a dispute involving similar movie titles, the factors articulated in *Polaroid* are to be applied as they would in any other dispute involving commercial products. Indeed, this Court has already held in this case that "the footnote to the court's holding in *Rogers* specifically states that [the First Amendment] does not apply to claims ... of confusingly simi-

lar titles." *Tri–Star*, 749 F.Supp. at 1253 (citing *Rogers*, 875 F.2d at 999 n. 5) ("[t]he public interest in sparing consumers this type of confusion outweighs the slight public interest in permitting authors to use such titles."); *see Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc.*, 886 F.2d 490, 494 (2d Cir.1989).

*tions*, 830 F.2d at 1226; *McGregor–Doniger*, 599 F.2d at 1133.

■ The degree of protection afforded to a mark is dependent on the strength or distinctiveness of the mark, *Nikon Inc.*, 803 F.Supp. at 915, such that strong marks are entitled to broad protection. *Nikon, Inc.*, 987 F.2d at 94; *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987). This is because a mark that is strong, due to its fame or its uniqueness, has a greater likelihood of being remembered and thus is more likely to be associated in the minds of consumers than is a mark that is weak. *Mobil Oil Corp.*, 818 F.2d at 258 (quoting *James Burrough, Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 276 (7th Cir. 1976)).

■ There is considerable evidence that demonstrates the strength of Plaintiffs' marks in their commercial context. As previously noted, Bridge has received vast unsolicited media coverage in mass circulation newspapers and magazines as well as coverage in the electronic media. It has been the subject of critical and popular acclaim, which has provided sales success totaling over $51 million. Finally, Bridge has been used exclusively by Plaintiffs or their predecessors for 40 over years. This evidence is indicative of the substantial strength that Plaintiffs' marks have achieved in their market.[13] Accordingly, this Court finds that Plaintiffs' marks possess significant strength which strongly favors a finding of likelihood of confusion.

■ Second, the question of the similarity of Plaintiffs' and Defendants' marks turns upon "how they are presented in the marketplace." *The Sports Authority, Inc.*, 89 F.3d at 962. The purpose of this inquiry is to determine the " 'general impression conveyed to the purchasing public by the respective marks,' " *Hasbro, Inc. v. Lanard Toys, Ltd.*,

858 F.2d 70, 77 (2d Cir.1988) quoting *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir.1985), and whether the similarity between them is likely to cause confusion. *Hasbro*, 858 F.2d at 77.

Here, the evidence of the similarity of the marks as presented in the market place, is irrefutable. Defendants' mark is substantially similar to Plaintiffs' mark "The Bridge on the River Kwai," and is identical to Plaintiffs' mark, the phrase "River Kwai" in the title of a motion picture. Additionally, both goods are motion pictures presented through the same channels of trade and aimed at a similar class of purchasers. Accordingly, this factor convincingly supports a finding of likelihood of confusion.

Third, the competitive proximity of the products factor focuses on whether the two products compete with each other.[14] *W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir.1993). *See Nikon, Inc.*, 987 F.2d at 95; *Kraft General Foods, Inc. v. Allied Old English, Inc.*, 831 F.Supp. 123, 130 (S.D.N.Y.1993). The concern is whether it is likely "that customers may be confused as to the source of the products, rather than as to the products themselves." *McGregor–Doniger*, 599 F.2d at 1134. *See Arrow Fastener Co.*, 59 F.3d at 396; *Centaur Communications*, 830 F.2d at 1226–27. Where the two products compete, there is a greater likelihood that the use of similar marks will cause consumer confusion. *Giorgio Beverly Hills, Inc. v. Revlon Consumer Products Corp.*, 869 F.Supp. 176, 183 (S.D.N.Y.1994) (citing *Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 582 (2d Cir.1991)).

The evidence dealing with the competitive proximity of the products is incontrovertible. Bridge and Return are both motion pictures are set toward the end of World War II and

---

**13.** Defendants argue that it was the subsequent and pervasive references to the "River Kwai" as a historical place, and not as a film, which led the terms "River Kwai" to be associated in the public mind. This argument is rejected as this Court precluded evidence concerning whether the words "River Kwai" describe a real geographic place, and because the assertion is wholly unsupported by the record.

**14.** This factor must be measured with reference to the first two *Polaroid* factors—the strength of the mark and similarity of the marks. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir.1987).

involve allied prisoners of war held captive by the Japanese. More importantly, both motion pictures are distributed through identical channels, i.e. theaters, television and video rentals, and compete in identical markets. Nevertheless, Defendants argue that there is no direct competition here because the intended market for Return is different than Bridge's audience market and because Return will initially be released in theaters, a market in which Bridge no longer competes. Both arguments are without merit. First, there is no evidence that suggests that Return's intended market is to be different than Bridge's. Second and more importantly, although Bridge may never be re-released into general theaters, Return will directly compete with Bridge through the other distribution channels thereby increasing the likelihood of confusion among consumers as to the source of the products.

Consequently, because Plaintiffs' and Defendants' products are in such close competitive proximity, this Court concludes that this factor weighs heavily in favor of finding a likelihood of confusion. *See W.W.W. Pharmaceutical Co., Inc.,* 984 F.2d at 573. This finding is enhanced by this Court's previous determination that Plaintiffs' marks are strong and that there is clear similarity between the marks at issue. *See Mobil Oil Corp.,* 818 F.2d at 258.

The fourth factor, the likelihood that Plaintiffs will "Bridge the gap" and offer a product like Defendants,' refers to whether "the senior user of the mark is likely to enter the market in which the junior user is operating." *Centaur Communications,* 830 F.2d at 1227. This factor helps establish the possibility of likelihood of confusion as to the source in the future. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 874 (2d Cir.1986).

As this Court has noted, the evidence clearly establishes that the parties already operate in close competitive proximity. Where, as here, there is already an overlap

in the market for the parties' products, there is no gap to bridge and the likelihood of confusion is greater.[15] *See Hasbro,* 858 F.2d at 78; *Nikon, Inc.,* 987 F.2d at 95; *North American Graphics, Inc. v. North American Graphics of U.S., Inc.,* 1997 WL 316599, at *5 (S.D.N.Y. June 10, 1997). *See also Paddington Corporation,* 996 F.2d at 586 (stating that because the marks would compete in the same market, the likelihood of bridging the gap factor was irrelevant). This factor strongly supports a finding of a likelihood of confusion. *See North American Graphics,* 1997 WL 316599, at *5; *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.,* 1996 WL 125641 at *10 (S.D.N.Y. Mar.21, 1996), *aff'd* 111 F.3d 993 (2d Cir.1997).

The fifth Polaroid factor is whether there is any actual confusion between the products. Although the party seeking to demonstrate a likelihood of confusion need not show actual confusion, evidence of actual confusion is highly probative as to whether likelihood of confusion exists. *Schieffelin & Co., v. Jack Co. Of Boca, Inc.,* 850 F.Supp. 232, 245 (S.D.N.Y.1994); *See Mobil Oil Corp.,* 818 F.2d at 259; *Stern's Miracle-Gro Products, Inc.,* 823 F.Supp. at 1087.

Here, evidence of actual confusion is significant. Even though Return has yet to be released or advertised in the United States, numerous newspaper articles have expressly identified Return as a sequel to Bridge. *See e.g.* P–118; P–136; P–139a. This demonstrates that actual confusion already exists even among journalists and film reviewers, who arguably are more sophisticated about motion pictures than ordinary consumers. Additionally, the market surveys entered into evidence suggest actual confusion here. Without agonizing over all of the details of the findings of the confusion surveys, and acknowledging that both Defendants' and Plaintiffs' surveys minimized and maximized the confusion results respectively, this Court concludes that there is some evidence of actual confusion under both parties surveys.[16]

---

**15.** Defendants argue that Plaintiffs have no intention of re-releasing Bridge into general theater distribution. Once again Defendants ignore the fact the marks will overlap in the other distribution markets thereby eliminating the need to bridge the gap.

**16.** Dr. Ericksen's confusion survey demonstrated confusion among consumers in that it found that

The numerous incidents of actual confusion here stand as convincing evidence that a likelihood of confusion exists.

■ Sixth, the good faith on Defendants' part factor focuses on "'whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product.'" *The Sports Authority, Inc.* 89 F.3d at 964 (quoting *Lang*, 949 F.2d at 583). *See Spring Mills, Inc. v. Ultracashmere House, Ltd.*, 689 F.2d 1127, 1134–35 (2d Cir.1982). Evidence of a junior user's bad faith or intentional copying gives rise to the presumption that the junior user has intended to create a confusingly similarity of appearance and succeeded. *See Warner Bros., Inc. v. American Broadcasting Cos., Inc.*, 720 F.2d 231, 246–47 (2d Cir.1983). Additionally, it also raises the presumption of a likelihood of confusion. *Paddington Corp.*, 996 F.2d at 586. *But see Lois Sportswear*, 799 F.2d at 875 (stating that intent is irrelevant in determining consumer confusion as to the source of a product).

■ Bad faith can be demonstrated by a showing of actual or constructive knowledge of the prior user's mark. *See Mobil Oil Corp.*, 818 F.2d at 259. In addition, where the infringing marks are identical, defendant has the burden of persuading the court that there is a credible innocent explanation. *See Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.*, 411 F.2d 1097, 1101 (2d Cir.1969). Failure by Defendants to do so further supports the inference of bad faith. *See Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*, 80 F.3d 749, 753 (2d Cir.1996). *See also Centaur Communications*, 830 F.2d at 1228 (stating that an infer-ence of bad faith is bolstered by a finding that the defendant did not present a credible innocent explanation for the infringing mark).

This Court has already held that compelling evidence exists that Unger intentionally chose and retained the title Return in bad faith. To reiterate, Unger, at the time of adopting the title Return, had actual knowledge of Plaintiffs' marks, but insisted on his title despite the fact that his motion picture was not a sequel to Bridge. He knew, yet was unconcerned, that some consumers might be confused by the title Return. He also knew that Plaintiffs, on numerous occasions, objected to his use of the title Return, and that such objections, contrary to Defendants' assertions, were never withdrawn. Additionally, Unger attempted to associate Return with Bridge at the Cannes Film Festival by referring to Bridge in Return's descriptive brochure. Further, Return was released in Japan with the title "Bridge on the River Kwai" followed by the roman numeral II. Finally, Unger was evasive and incredible as a witness at trial.

Defendants attempt to offer a credible innocent explanation for choosing and refusing to change the title Return by stating that they sought to use the title of the book to which they had purchased the movie rights, registered with the MPAA and in which they had invested significant time, money and energy in producing. This explanation is incredible. As noted, Defendants knew that Plaintiffs objected to their title since 1978, before investing a significant amount of time, money and energy. Defendants also are aware that Columbia's 1987 protest to the MPAA has never been resolved. This Court

---

49% of telephone respondents answered affirmatively when asked whether they had heard of Return. *See* Pls.Ex. 232 at 8. Twenty-five of those respondents said they had seen Return while 40% either described Bridge or said Return was a sequel to Bridge. *See id.* Plaintiffs' other survey, conducted by Dr. Bruno in 1997, also reveals consumer confusion. For example, almost 30% of all respondents said that they thought of Bridge after reading the title Return, *see* Pls.Ex. 237 at 15, and almost 24% of all respondents thought Return was a sequel to Bridge, an updated version of Bridge, or involved a return to the "River Kwai" when asked

what they thought Return was about. *See* Pls.Ex. 237 at 16–17. Finally, Defendants' experts' surveys indicated that consumer confusion was only approximately 7.3%, *See* Defs.Ex. 260, Ex. A, a level that Defendants contend is too minimal to support a finding of a likelihood of confusion. However, Defendants' contention ignores case law that has held otherwise. *See Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 365 F.Supp. 707, 716 (S.D.N.Y. 1973), *aff'd*, 523 F.2d 1331 (2d Cir.1975) (holding that a confusion level of 7.7% was sufficient to support a finding of a likelihood of confusion).

thus finds that Unger has failed to meet his burden to offer a "credible innocent explanation" for his use of the title Return, and holds that this further supports the inference of Unger's bad faith.

Defendants also attempt to show their good faith by stating that they offered to change the title to "March From the River Kwai." However, Defendants knew that Plaintiffs had claimed trademark protection in the phrase "River Kwai." Thus, this Court does not see how Defendants can seriously argue that their offer to change the title was made in good faith. Defendants further attempt to demonstrate good faith by noting that they agreed to change their title to "Return From the River Kwae Noi" pursuant to this Court's suggestion.[17] Although this Court considers Defendants' action here as a good faith gesture, it is not sufficient to overcome the substantial evidence of bad faith on the part of the Defendants. This Court thus finds that such evidence of bad faith is persuasive evidence that a likelihood of confusion exists between Return and Plaintiffs' marks. *See Majestic Drug Co., Inc.*, 1997 WL 37955, at *10.

The seventh factor looks to the quality of Defendants' product. Although more than one view exists as to the significance of differences in quality in determining the likelihood of confusion, one accepted view is that a likelihood of confusion may result if the quality of Defendants' product is inferior because an inferior product, sold by a junior user, can injure a Senior user's reputation as consumers may think that the inferior product was produced by the senior user. *See Hasbro*, 858 F.2d at 78; *Nikon Inc.*, 987 F.2d at 95; *Bear U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc.*, 909 F.Supp. 896, 907 (S.D.N.Y.1995). The evidence demonstrates that Return has received poor reviews. For instance, the London Evening Standard stated that Return was an "unintentional parody" and that "[t]hey should cut their losses in advance and call it a comedy." Pls.Ex. 138. A review published by Variety stated that Return is an "artless WWII action whose

only hope is that its resonating title will pull business via fast playoff on the circuits." Pls.Ex. 139a. Indeed, even Unger could not identify a single positive review of Return. Tr. at 147–48.

It is undisputed that Bridge has received widespread critical and popular praise and is considered by some as one of the top motion pictures of all time. Since, as the above evidence indicates, Return is considered to be a below average quality film, it is conceivable that Plaintiffs' reputation could be adversely affected if consumers believe that Plaintiffs produced Return. Thus, the Court finds the poor quality of Return stands as strong evidence of a likelihood of confusion.

The eighth and final Polaroid factor, the sophistication of buyers factor, "examines the amount of care and attention that a consumer takes in evaluating a product before making a purchase." *Kraft General Foods, Inc.*, 831 F.Supp. at 133 (citations omitted). This factor is based on the belief that unsophisticated consumers exacerbate the likelihood of confusion especially where the products' marks are similar, inexpensive and in competitive proximity. *Hasbro*, 858 F.2d at 79. The more sophisticated and careful the consumer is, the less likely it is that similarities in trade marks will cause confusion concerning the source or sponsorship of the product. *See Bristol–Myers Squibb Co.*, 973 F.2d at 1046.

In general, the greater the value of a product, the more careful the consumer can be expected to be. *McGregor–Doniger, Inc.*, 599 F.2d at 1137. Alternatively, consumers are not apt to be very careful when purchasing relatively inexpensive products. *See Stern's Miracle–Gro Products, Inc.*, 823 F.Supp. at 1089.

Motion picture tickets, video rentals and television viewing are relatively inexpensive and thus consumers of such are likely to pay less care and attention when purchasing these products and therefore are inclined to be less sophisticated buyers. As such, it is more likely that the similarities in the marks at issue will cause confusion among consum-

---

**17.** "River Kwae" is phonetically the same as "River Kwai." Not surprisingly, Academy re-jected this title.

ers as to the source of the marks. Therefore this Court concludes that this factor favors a finding of likelihood of confusion. *See The Sports Authority, Inc.*, 89 F.3d at 965.

This Court finds that most, if not all, of the *Polaroid* factors have been met. The undisputed strength of Plaintiffs' marks in their commercial context, the substantial similarity between Plaintiffs' and Defendants' marks, the close competitive proximity of the products, the lack of a "bridge to gap," the amount of actual confusion between the products, the Defendants' lack of good faith, the poor quality of Return and the lack of sophistication of the relevant consumer group all support the conclusion that numerous ordinarily prudent viewers are likely to be mislead or confused as the source of Defendants' motion picture. *See Gruner + Jahr USA*, 991 F.2d at 1077. Therefore, this Court finds that there is a likelihood of confusion between Return and Plaintiffs' marks which entitles Plaintiffs' marks to broad protection against infringers.

Accordingly, this Court concludes that Plaintiffs have satisfied their burden of proof under Section 43(a) of the Lanham Act, demonstrating that their marks—the title "The Bridge on the River Kwai" and the words "River Kwai" when used in the title of a motion picture—have achieved secondary meaning and that the release of Return likely will cause confusion among consumers.

 This Court further concludes that Plaintiffs have demonstrated a risk of irreparable injury flowing from the likelihood of confusion. *See LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 79 (2d Cir.1985) (holding that a likelihood of confusion is strong evidence that in the absence of an injunction a party might face irreparable harm); *Stern's Miracle–Gro Products, Inc.*, 823 F.Supp. at 1094 (same). This, however, does not automatically compel the issuance of an injunction to bar the use of the junior user's mark. *Jim Beam Brands Co. v. Beamish & Craw-*

*ford*, 937 F.2d 729, 737 (2d Cir.1991), *cert. denied*, 502 U.S. 1094, 112 S.Ct. 1169, 117 L.Ed.2d 415 (1992). Nevertheless, after careful consideration, including a balancing of the conflicting interests of the parties, this Court concludes that, as a result of this risk of irreparable injury, a permanent injunction is necessary to protect Plaintiffs' marks.[18] *See id.; Sage Realty Corp. v. Sage Group, Inc.*, 711 F.Supp. 134, 142 (S.D.N.Y.1989).

 This Court rejects Defendants' request for the use of a disclaimer in lieu of an injunction. In order for this Court to find that a disclaimer is a more appropriate form of relief than a permanent injunction, Defendants bear the heavy burden of setting forth evidence sufficient enough to demonstrate that its proposed disclaimer would significantly reduce the likelihood of consumer confusion. *See Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*, 832 F.2d 1311, 1315–16 (2d Cir.1987); *Clinique Laboratories, Inc. v. Dep Corp.*, 945 F.Supp. 547, 556 (S.D.N.Y.1996).

Defendants have not proposed a disclaimer nor have they offered any evidence that a disclaimer would significantly reduce the likelihood of consumer confusion created by the title Return. Defendants thus have failed to meet their burden. As a result, this Court rejects Defendants' request to use a disclaimer. *See Charles of Ritz Group, Ltd. v. Quality King Distributors, Inc.*, 832 F.2d 1317, 1324 (2d Cir.1987) (denying an application for use of a disclaimer where defendant failed to establish evidence that the disclaimer would reduce consumer confusion); *Clinique Laboratories, Inc.*, 945 F.Supp. at 557–58 (same).

*Laches*

Defendants argue that Plaintiffs are not entitled to injunctive relief because Plaintiffs' claim is barred by the doctrine of laches. Defendants state that it would be fundamentally unfair for this Court to grant Plaintiffs an injunction where Plaintiffs failed to timely

---

18. Whereas the standards for trademark infringement are essentially the same under the Lanham Act, New York law and the common law, this Court concludes that Defendants have similarly infringed upon Plaintiffs' marks under New York law and the common law. *See Int'l*

*Data Group*, 798 F.Supp. at 138; *Riverhead Paints Plus, Inc. v. PPG Industries, Inc.*, 1987 WL 16877, at *2 (E.D.N.Y. Jan.13, 1987). This provides further support for the issuance of an injunction.

assert any purported trademark interest in the term "River Kwai." In support of this argument, Defendants state that Plaintiff asserted a trademark interest in the term "River Kwai" after Defendants had completed production of Return, had spent close to $9 million on it, had released Return throughout the entire world using the same name and had received publicity of their film at the Cannes Film Festival.

Plaintiffs assert that Defendants have failed to prove laches. They state that Defendants were not prejudiced by Plaintiffs' conduct, and that they had repeatedly placed Defendants on notice of their objections to the title Return. In addition, Plaintiffs argue that Defendants are precluded from asserting laches as a defense because of Defendants' bad faith in adopting the title Return.

▋ Defendants bear the burden of proving laches. To do so, Defendants must demonstrate that Plaintiffs had knowledge of Defendants' use, "inexcusably delayed in taking action" *and* that Defendants will suffer prejudice if Plaintiffs are allowed to assert their right at this time. *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1040 (2d Cir.1980) (citing *Cuban Cigar Brands*, 457 F.Supp. at 1096). Additionally, the defense of laches is barred where defendants purposefully committed the infringing conduct. *See Harlequin Enterprises Ltd.*, 644 F.2d at 950.

▋ First, it is beyond dispute that Plaintiffs had knowledge of Defendants' intent to use the title Return as early as 1978. Having demonstrated knowledge, Defendants now must show that Plaintiffs delayed in taking action, and that the delay was "inexcusable." Although Defendants contend that Plaintiffs "inexcusably delayed" in taking action against Defendants, the evidence suggests otherwise. As noted, upon learning that Defendants had registered the title Return with the Title Registration Bureau of the MPAA in May of 1978, Plaintiff Columbia immediately wrote to Leisure Time and the MPAA to protest the title on the grounds of harmful conflict with and similarity to Bridge. *See supra* at 346. Although the protest was never resolved by the MPAA as it was allegedly received after the MPAA's seven day time limit to file protests, the letter served to put Defendants on notice as early as May, 1978 that Plaintiffs protested the use of the title Return for their motion picture.

In addition, Defendants were repeatedly put on notice in the 1980s that Plaintiffs objected to the title Return. For instance, in 1984, while in negotiations with Unger to distribute Return outside the United States, Columbia allegedly informed Unger that he needed to obtain permission or a waiver from the producer of Bridge to use the title Return. *See Supra* at 346–347. In June, 1987, and twice in August, 1987, Columbia sent letters to Unger advising him that use of the title Return would infringe on Columbia's and Horizon's right in Bridge and potentially violated trademark and unfair competition statutes. The letters also insisted that Unger cease and desist from any further use of the title Return, warning that continued use would be to his peril. In July 1987, Tri–Star registered the title Return with the title Registration Bureau of the MPAA. Again, Columbia immediately filed a timely protest with the MPAA, who reported the protest in the MPAA Title Report dated July 14, 1987 declaring that the title will not be cleared for registrant's use until the protest was resolved. Finally, in November 1988, Academy sent a letter to Columbia informing it that any use of a title with the name "River Kwai" would be met by a lawsuit to protect Academy's rights in the title.

Plaintiffs' warning letters placed Defendants on notice of Plaintiffs' objections to his use of the title Return, and did so well before Defendants began filming their movie. This Court finds that these actions constitute a "sufficient taking of action to avert [a] defense" of laches. *Lambda Electronics Corp. v. Lambda Technology, Inc.*, 515 F.Supp. 915, 930 (S.D.N.Y.1981). *See also Saratoga Vichy Spring Co.*, 625 F.2d at 1041. (stating that a letter of warning will suffice to rebut a claim of delay and place an infringer on notice of a potential suit); *Imagineering, Inc. v. Van Klassens, Inc.*, 851 F.Supp. 532, 536 n. 2 (S.D.N.Y.1994) (same). Accordingly, this Court concludes that Defendants have not met their burden of demonstrating that

Plaintiffs inexcusably delayed in providing notice of their objections.

 Defendants laches argument also fails here because they have not satisfied their burden as to the second half of the laches inquiry which demands the showing of prejudice. In order to establish prejudice, Defendants must prove that they "changed [their] position in a way that would not have occurred if the plaintiff had not delayed." *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2d Cir.1996). Thus, it is not sufficient for Defendants to prove that they had planned to use the mark. Defendants must show that they had taken affirmative steps to increase their reliance on the mark during Plaintiffs' alleged delay. *See Tap Publications, Inc. v. Chinese Yellow Pages (New York), Inc.*, 925 F.Supp. 212, 223–24 (S.D.N.Y.1996) (holding that prejudice was not established where there was no evidence that the alleged infringer "expanded its production, distribution, or advertising relying on the mark").

Defendants have failed to demonstrate that they were prejudiced by, or relied upon Plaintiffs' alleged inaction.[19] There is no evidence here that Defendants changed their position in a way that they would not have or took steps to increase their reliance on the mark during Plaintiffs' alleged delay.[20] Nor is there any evidence that Defendants spent any money in the United States to promote their picture with the title Return. Indeed, Defendants did not even fund the English-language title Return until early 1989, after

this suit was filed and well after they were aware that Plaintiffs objected to its use.

In addition, Defendants cannot establish prejudice here because an infringing party does not suffer prejudice where it would cost little to remedy the infringement. *See McDonald's Corp.*, 814 F.Supp. at 1138 (rejecting laches defense where the only evidence of prejudice was the "anticipated minimal expenses associated with changing the name on its signage and stationary"). Here, the evidence shows that Defendants could have changed the title name for approximately $22,000, a slight cost considering the amount of money spent on making the motion picture and the fact that Defendants did not fund the English-language title until well after they were first notified that Plaintiffs objected to it, and after this suit was filed.

 Further, Defendants' argument that laches exists because Plaintiffs could have and should have filed this suit prior to 1988 is without merit. A laches defense cannot be successful where, as here, the holder of the mark fails to file suit to protect its mark from an unfinished, untitled product. *See Schieffelin*, 850 F.Supp. at 252 (quoting *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 366 (6th Cir.1985), *cert. denied*, 476 U.S. 1158, 106 S.Ct. 2277, 90 L.Ed.2d 719 (1986)). In other words, Plaintiffs did not have to sue at the first sign of infringing use. Indeed, that would have been premature, and could have jeopardized Plaintiffs' chances for a remedy "due to the potential absence of actual confusion."[21] *Schieffelin*, 850 F.Supp. at

**19.** Indeed, it is difficult show prejudice where, as here, Defendants were well aware of Plaintiffs' claim of superior rights in the mark. *See Dial-A–Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F.Supp. 1339, 1357 (E.D.N.Y.1994).

**20.** Thus, this case is a wholly different than those laches cases that support finding of prejudice. *See e.g. Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2d Cir.1996) (affirming a finding of prejudice where plaintiff's five-year delay in bringing suit precluded the possibility that the alleged infringer could "effectively adopt an alternative marketing position" after already committing massive resources to a marketing campaign); *Trustees of Columbia University v. Columbia/HCA Healthcare Corp.*, 964 F.Supp. 733, 753 (S.D.N.Y.1997) (finding prejudice where "defendant spent millions of dollars developing programs that prominently feature[d]" the

infringing mark, including, *inter alia*, an Internet site, an 800 phone number, a Visa card, advertising and promotion).

**21.** Had Plaintiffs filed their law suit before Defendants were committed to using the title Return, they risked having their action dismissed for a lack of a case or controversy. *See S. Jackson & Son v. Coffee, Sugar & Cocoa Exchange*, 24 F.3d 427, 431 (2d Cir.1994) (holding that federal courts may only preside over a case where an actual controversy exists as "a necessary prerequisite to the exercise of judicial power is the presence of 'a claim of substantive right' that triggers the adjudicative function of the court") (citations omitted); *Liberty Cable Co., Inc. v. City of New York*, 893 F.Supp. 191, 199 (S.D.N.Y.), *aff'd*, 60 F.3d 961 (2d Cir.1995), *cert. denied*, 516 U.S. 1171, 116 S.Ct. 1262, 134

252. *See Johanna Farms, Inc. v. Citrus Bowl, Inc.,* 468 F.Supp. 866, 881 (E.D.N.Y. 1978) (holding that laches does not accrue "until there exists an actual clash of interests").

■ Plaintiffs needed only to have acted when " 'the likelihood of [public] confusion loom[ed] large.' " *Schieffelin,* 850 F.Supp. at 252 (quoting *Johanna Farms, Inc.,* 468 F.Supp. at 881). Thus, Plaintiffs actions here were appropriate under the circumstances. They filed suit after it became apparent that Defendants intended to proceed with plans to produce Return.[22] Bringing the suit prior to then would have been premature, thus Plaintiffs failure to do so cannot be laches.

■ Finally, it is well known that a laches defense is unavailable where a defendant intentionally infringes on a plaintiff's mark. *See Harlequin Enterprises, Ltd.,* 644 F.2d at 950. Here, in light of the abundant evidence that Defendants acted in bad faith by adopting the title Return with the intent to trade on the goodwill, fame and reputation of Plaintiffs' marks, this Court finds that Defendants' laches defense is disingenuous. This Court is not at all persuaded that Defendants adopted the marks in good faith and without the intent to confuse the public. *See Nikon, Inc.,* 803 F.Supp. at 925 (quoting *Cuban Cigar Brands,* 457 F.Supp. at 1099–1100) (rejecting defendants good faith argument where " '[d]efendant ha[d] tried to move its name as close as possible to what it perceived to be the legal line, rather than keeping its mark and use distinct and separate' "). Accordingly, this Court holds that Defendants laches defense is without merit. *See Imagi-*

*neering, Inc.,* 851 F.Supp. at 535 (holding that a "finding of bad faith alone is sufficient to defeat defendants' laches claim").

In sum, This Court concludes that Defendants cannot satisfy either prong of the laches inquiry—not only have Defendants failed to demonstrate that Plaintiffs delayed inexcusably in taking action, but the record is devoid of any evidence of prejudice suffered as a result of Plaintiffs' alleged delay. Additionally, a laches defense is unavailable to Defendants here because they intentionally infringed upon Plaintiffs' marks and adopted and used the title Return in bad faith.

Accordingly, this Court permanently enjoins Defendants Kurt Unger and Leisure Time Productions, B.V., their officers, agents, servants, employees and attorneys and any other persons in active concert and participation with them who receive actual notice of the order, from releasing, distributing or advertising in the United States the produced, but unreleased, motion picture "Return from the River Kwai" with that title or with any other title containing the words "River Kwai" or any title that is confusingly similar to "The Bridge on the River Kwai" or "River Kwai."

### Other Claims

This Court now turns to the remaining two issues of whether Plaintiffs are entitled to relief under the New York Dilution law, New York General Business Law Section 360–1,[23] and under Federal and New York unfair competition laws.[24]

### New York Dilution Law

Section 360–l states that "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade

L.Ed.2d 210 (1996) (stating that "[r]ipeness is a constitutional prerequisite to exercise of jurisdiction by federal courts") (citations omitted).

22. The suit was filed only nine months after principal photography for Return commenced, prior to the movie's release and before the title had been reduced to a final print.

23. Plaintiffs' Section 360–l claim was originally pleaded under New York General Business Law Section 368–d. However, on January 1, 1997, Section 368–d was repealed. The text of Section 368–d is now New York Business Law Section 360–l.

24. Plaintiffs suggest that they are also entitled to injunctive relief under section 43(c) of the Lanham Act, the anti-dilution provision. Section 43(c) was enacted in 1996, well after this action was brought. Nevertheless, Plaintiffs press this claim by arguing that Defendants will not be prejudiced as at least one of the Plaintiffs has continuously pled a claim under the New York dilution statute. Although this application for retroactive application of section 43(c) appears to be a case of first impression in this circuit, this Court is not convinced that Plaintiffs are entitled to relief under section 43(c).

name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." N.Y.Gen.Bus.Law § 360–*l*.

■ Section 360–*l* offers protection for a plaintiff's mark beyond what is provided by infringement and unfair competition laws, *Pan American World Airways, Inc. v. Panamerican School of Travel, Inc.*, 648 F.Supp. 1026, 1039 (S.D.N.Y.), *aff'd*, 810 F.2d 1160 (2d Cir.1986), in that it "protect[s] the distinctiveness of an owner's trademark from being undercut by another's similar use." *Dreyfus Fund, Inc. v. Royal Bank of Canada*, 525 F.Supp. 1108, 1125 (S.D.N.Y.1981). Indeed, section 360–*l* prevents the dilution of a strong mark by prohibiting in the owner's general field of commerce, use of the mark with the intent to exploit its favorable impression and associations. *Id.*

■ In order for Plaintiffs to succeed under their section 360–*l* claim, they must demonstrate that their mark "either is of truly distinctive quality or has acquired secondary meaning" *and* that there is a likelihood of dilution.[25] *Deere & Co. v. MTD Products, Inc.*, 41 F.3d 39, 42–43 (2d Cir. 1994). *See Stern's Miracle–Gro Products, Inc.*, 823 F.Supp. at 1090; *Pan American World Airways, Inc.*, 648 F.Supp. at 1039. The "distinctive quality" aspect of this test refers to "the strength of a mark for infringement purposes," *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1030 (2d Cir.1989), while dilution pertains to "the blurring of a trademark's product identification or the tarnishment of the affirmative associations a mark has come to convey." *Deere & Co.*, 41 F.3d at 42–43. *See Mead Data Central, Inc.*, 875 F.2d at 1031 (citing *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 624–26 (2d Cir.1983)).

■ This Court has already concluded that the mark Bridge and the words "River Kwai" when used in the title of a motion picture, have both attained secondary meaning, thus satisfying the first part of the test. This Court has also held that a likelihood of confusion exists between Plaintiffs' and Defendants' marks which is likely to blur Plaintiffs' marks' status as being the unique identifier of Plaintiffs' product. *See Deere & Co.*, 41 F.3d at 43. Accordingly, this Court finds that Plaintiffs have satisfied their burden under section 360–*l*,[26] and that this further entitles them to injunctive relief.

*Unfair Competition Laws*

■ It is well recognized that the standards for Section 43(a) claims of the Lanham Act and unfair competition claims under New York Law are almost indistinguishable. *Kregos v. Associated Press*, 795 F.Supp. 1325, 1336 (S.D.N.Y.1992), *aff'd*, 3 F.3d 656 (2d Cir.1993), *cert. denied*, 510 U.S. 1112, 114 S.Ct. 1056, 127 L.Ed.2d 376 (1994). *See Safeway Stores, Inc. v. Safeway Properties, Inc.*, 307 F.2d 495, 498 n. 1 (2d Cir. 1962); *Bio-Technology General Corp. v. Genentech, Inc.*, 886 F.Supp. 377, 384 (S.D.N.Y. 1995); *E.R. Squibb & Sons, Inc. v. Cooper Laboratories, Inc.*, 536 F.Supp. 523, 526 (S.D.N.Y.1982). A cause of action for unfair competition, under both the Lanham Act and New York common law, arises when there is an attempt by a party to "pass off" his goods as those of another. *Pan American World Airways, Inc.*, 648 F.Supp. at 1039 (quoting *Ideal Toy Corp. v. Kenner Products, Etc.*, 443 F.Supp. 291, 305 (S.D.N.Y.1977)). Additionally, both unfair competition laws prohibit "a broader range of unfair trade practices generally described as the misappropriation of the skill, expenditures and labors of another." *Id. See Stern's Miracle–Gro Products, Inc.*, 823 F.Supp. at 1093; *Rosenfeld v. W.B. Saunders*, 728 F.Supp. 236, 249–50 (S.D.N.Y.), *aff'd*, 923 F.2d 845 (2d Cir.1990).

■ In order for Plaintiffs to succeed in demonstrating unfair competition under both the Lanham Act and the common law, Plaintiffs must show a likelihood of confusion or

---

**25.** Predatory intent of the defendant, although not an element, is a relevant consideration. *See Deere & Co. v. MTD Products, Inc.*, 41 F.3d 39, 42 (2d Cir.1994).

**26.** This finding is buttressed by evidence of Defendants' predatory intent, which this Court holds has been amply demonstrated by Defendants' bad faith.

deception of the consuming public as to the source of the allegedly infringing product, *American Footwear Corp.*, 609 F.2d at 664; *Radio Today, Inc. v. Westwood One, Inc.*, 684 F.Supp. 68, 72 (S.D.N.Y.1988), *and* bad faith on the part of Defendants. *See Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir.1980); *Stern's Miracle–Gro Products, Inc.*, 823 F.Supp. at 1093 ("there must be some element or showing of bad faith"). Proof of secondary meaning, however, is not required. *Stern's Miracle–Gro Products, Inc.*, 823 F.Supp. at 1093; *Pan American World Airways*, 648 F.Supp. at 1039.

■ This Court has already concluded both that there exists a strong likelihood of confusion among the purchasing public, and that Defendants have acted in bad faith in adopting and using the title Return. Accordingly, Plaintiffs have satisfied their burden to show unfair competition under both the Lanham Act and New York law, and this further entitles them to the remedy of injunctive relief.

*Attorney's Fees*

Finally, Plaintiffs request an award of attorney's fees. Attorney's fees are available to parties seeking protection of unregistered marks under Section 35(a) of the Lanham Act. 15 U.S.C. § 1117(a). *See Centaur Communications*, 830 F.2d at 1229 (holding that Section 35 applies to Section 43(a)); *IMAF, S.p.A. v. J.C. Penney Co., Inc.*, 810 F.Supp. 96, 98 (S.D.N.Y.1992) ("[t]he provision applies to cases involving registered and unregistered trademarks alike"). However, Section 35(a) of the Lanham Act provides that attorney's fees may only be awarded in "exceptional cases." 15 U.S.C. § 1117(a). *See Int'l Star Class Yacht Racing Ass'n*, 80 F.3d at 752; *Centaur Communications* 830 F.2d at 1229.

■ Additionally, attorney's fees can only be awarded under Section 35(a) upon a showing of bad faith or fraud by the defendants. *See Conopco*, 95 F.3d at 194–95. Indeed, courts have construed the phrase "exceptional cases" in the statute to mean cases involving deliberate infringement. *Gucci America, Inc. v. Rebecca Gold Enterprises,*

*Inc.*, 802 F.Supp. 1048, 1050–51 (S.D.N.Y. 1992). Moreover, it is an abuse of discretion for a district court to fail to consider an award of attorney's fees in cases involving willful infringement. *See Springs Mills, Inc. v. Ultracashmere House Ltd.*, 724 F.2d 352, 357 (2d Cir.1983).

■ This Court concludes that Defendants' intentional infringement here makes this case ripe for an award of attorney's fees. Defendants choice of the title Return and its insistence in using that title are indicative of Defendants' bad faith and its intention to profit from the fame of Bridge. Accordingly, Plaintiffs are entitled to an award of attorney's fees and costs of pursuing this litigation pursuant to a separate application and a hearing. *See Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 113–14 (2d Cir.1988), *cert. denied*, 490 U.S. 1006, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989); *Centaur Communications*, 830 F.2d at 1229; *PAF, S.r.1.*, 712 F.Supp. at 413.

*Conclusion*

Defendants Leisure Time, N.V. and Kurt Unger, and their officers, agents, servants, employees, and attorneys, and all persons in active concert and participation with them who receive actual notice of this order, are hereby permanently enjoined and restrained from releasing, distributing or advertising in the United States the produced, but unreleased, motion picture currently titled "Return from the River Kwai" with that title or under any other title containing the words "River Kwai" or under any title that is confusingly similar to "Bridge on the River Kwai" or "River Kwai."

It is ritualistic to emphasize that the aforementioned are this Court's findings of facts and conclusions of law.

SO ORDERED.